298-01/WDM/GMV
FREEHILL HOGAN AND MAHAR, LLP
Attorneys for Respondent Maersk
80 Pine Street 24th Floor
New York, New York 10005
Tel: 212 425 1900
Fax: 212-425-1901
Wayne D. Meehan (WM 9102)
Gina M. Venezia (GV 1551)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HORIZON LINES, LLC., f/k/a CSX LINES, LLC., | 08-CV-3982 (JSR) |
| Petitioner | **AFFIDAVIT OF WAYNE D. MEEHAN IN SUPPORT OF MAERSK'S CROSS-MOTON TO CONFIRM ARBITRATION AWARD AND IN OPPOSITION TO CSX'S APPLICATION TO VACATE AWARD.** |
| -against- | |
| A.P. Moller, Managing Owner of MAERSK-SEALAND, INC., | |
| Respondent | |

I, Wayne D. Meehan, declare as follows:

1.    I am a member of good standing of the Bar of this Honorable Court and a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Respondent A.P. Moller (hereinafter "Maersk") in the above-captioned matter.

2.    I was the attorney having primary responsibility for pursuing Maersk's claims against Petitioner Horizon Lines, LLC f/k/a CSX Lines, LLC (hereinafter "CSX") in the arbitration proceedings which resulted in the arbitration award (the "Award") that is the subject of the instant application.

3.    I submit this affidavit based upon my personal knowledge and in support of Maersk's cross-motion to confirm the arbitration award and in opposition to CSX's petition to vacate the award.  The purpose of this affidavit is to introduce the following exhibits:

Exhibit A:    Arbitration Award issued by the Society of Maritime Arbitrators;

Exhibit B:    The contract between Maersk and CSX.

Exhibit C:    Maersk's pre-hearing submission submitted in the arbitration;

Exhibit D:    Maersk's main brief submitted in the arbitration at the conclusion
              of the hearings;

Exhibit E:    Maersk's Reply Brief submitted to the arbitrators; and

Exhibit F:    Affidavit of Aogu Andrew Tsukamoto of Maersk which was submitted
              in the arbitration.

DATED:      July 11, 2008

_____
WAYNE D. MEEHAN

Sworn to before me this
11th day of July 2008.

_____
Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No, 5-1692
Certificate Filed in New York
Commission Expires 4/4/10

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all attorneys of record. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the below service list in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notice of Electronic Filing.

**VIA CM/ECF:**

      Vincent M. DeOrchis
      M.E. DeOrchis
      DeOrchis & Partners
      61 Broadway - 26th Floor
      New York, N.Y.  10006


/s/ Wayne D. Meehan
Wayne D. Meehan

# Exhibit A

Meehan Affidavit in Support

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In the Matter of the Arbitration
     between

Maersk Sealand,
        as Charterer,                     **Final Award**

     and

CSX Lines, LLC,
        as Owner,

under a Space Charter and Transportation
Service Contract dated December 9, 1999.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before:
        Manfred W. Arnold
        Jack Berg
        David W. Martowski,
                Chairman

Appearances:
        Freehill Hogan & Mahar, LLP
        on behalf of Maersk Sealand
        by Wayne D. Meehan, Esq.
          Gina M. Venezia, Esq.


        DeOrchis Weiner & Partners, LLP and
        Emard Danoff Port Tamulski & Paetzold, LLP
        on behalf of CSX Lines, LLC
        by  M.E. DeOrchis, Esq.
          Eric Danoff, Esq.
          Vincent DeOrchis, Esq.
          John A. Orzel, Esq.

EXHIBIT

A

## Introduction

Maersk Sealand, as charterer ("Maersk" or "Charterer"), seeks indemnity in the amount of $2,684,103.25 from CSX Lines, LLP (now Horizon Lines), as owner ("CSX" or "Owner"), for claims it settled with various cargo interests arising from containers lost overboard during voyages of the CSX HAWAII, CSX PACIFIC and CSX DISCOVERY from Asian ports to the United States West Coast during January and December, 2000. The vessels were performing voyages under a Space Charter and Transportation Service Contract dated December 9, 1999 ("Contract"). CSX denies liability for the loss of the containers and counterclaims for physical damage to its vessels during these incidents. CSX's counterclaim is for $210,333.66. Both parties also claim interest, attorneys' fees, arbitrators' fees and costs.

## Background

At all relevant times CSX and Maersk were experienced owners and operators of container vessels operating in international trade with a global network of supporting offices and terminals.

On December 9, 1999, CSX and Maersk entered into the Contract under which CSX chartered space and transported containers on its vessels from the Far East to U.S. West Coast ports. CSX also transported containers pursuant to the Contract on its own behalf to and from the U.S. West Coast, Hawaii and Guam. The anticipated route outbound from the United States was Tacoma, Hawaii, Guam, Hong Kong and Kaohsiung. CSX's World Terminal's stevedores loaded its cargo at Hong Kong and Maersk's APM Terminal stevedores loaded its cargo at Kaohsiung. Maersk paid the stevedoring charges for the loading of its containers, but all the vessels' container securing equipment was owned, maintained and provided by CSX.

2

## Proceedings

Maersk commenced these proceedings by appointing Jack Berg as its arbitrator and CSX responded with the appointment of Manfred W. Arnold. Thereafter, Messrs Berg and Arnold appointed David W. Martowski as chairman of the panel. Six evidentiary hearings were held in New York City at which a number of fact and expert witnesses testified. Voluminous documentary evidence was introduced, including the depositions of vessel personnel, photographs, survey reports and logbooks. Main and reply post hearing briefs were exchanged and although the proceedings were closed on July 24, 2007, the Panel continued receiving documentation from the parties.

## Contract

Article 2 sets forth the purpose of the agreement, which was for CSX to charter space to, and transport cargo and containers for Maersk for a period of five years unless terminated sooner by circumstances enumerated in Article 9. The Contract describes Maersk as an ocean common carrier in United States foreign commerce and CSX as a water carrier in the U.S. non-contiguous domestic trade, operating vessels on voyages between the United States West Coast ports, Hawaii and Territory of Guam and the Far East ports of Hong Kong and Kaohsiung, Taiwan.

The geographic scope of the Contract covers the foreign trade handled by Maersk between the United States ports of Tacoma, Oakland, Honolulu, Territory of Guam and U.S. inland and coastal points served via such ports, and Hong Kong and Kaohsiung and inland and coastal points served via such ports. The Contract also describes the domestic trade handled by CSX as between the Jones Act trade lanes specifically described in the Contract Appendix.

The Contract terms most relevant to the issues in this case provide, in pertinent part:

### Article 7: Liabilities and Indemnities

7.1    The carriage, custody and care of goods hereunder shall be subject to the Hague Rules, 1924, as enacted in and interpreted under the

3

United States Carriage of Goods by Sea Act, 1936 ("COGSA"), as amended from time to time . . . .

For the purposes of determining any limitations of liability available the descriptions, weights, numbers/packages and customary freight units indicated in the Maersk Bill of Lading issued to its customers shall be deemed conclusive and binding as between Maersk and CSX.

7.2      As between the parties, CSX shall have the same rights, defenses, limitations and exoneration as Maersk has to or against its shippers in relation to goods transported under the Agreement . . . .

7.8      Maersk shall be entitled to handle and settle claims for loss of, damage to, misdelivery of or delay in delivery of cargo filed under and pursuant to its Bill of Lading or other contract of carriage, and shall further be entitled to grant such reasonable time extensions as Maersk deems necessary. Such handling and/or granting of time extensions shall not in any way prejudice Maersk's rights of recovery as against CSX hereunder.

### Article 10: Force Majeure

Each Party shall be excused from the performance of any obligation imposed upon it under this Agreement, if and insofar and for as long as such performance is delayed or prevented by circumstances beyond its reasonable control including, but not limited to strike, lock-out or labour disputes, other work stoppages, fire, typhoon, hurricane, flood, explosion, natural catastrophe, act of God, military operations, blockade, sabotage, revolution, civil commotion, hostilities, war or civil war, governmental regulations or controls, participation in the U.S. Department of Defense Emergency Preparedness Program or other U.S. military national security agreements, or any similar event.

\*          \*          \*          \*

### Article 11: Governing Law and Arbitration

Any controversy or claim arising out of or relating to this Agreement, or the arbitrabilty of such controversy or claim, or the breach, termination or validity of the Contract, shall be settled by arbitration in accordance with the Rules of the Society of Maritime Arbitrators, Inc. (the "SMA"). Unless the parties agree on a sole arbitrator, one arbitrator shall be appointed by each party. The arbitrators so appointed shall appoint a third arbitrator, and the three arbitrators shall constitute the arbitration tribunal. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. section 1-16, and judgment upon the award rendered by the tribunal may be entered

by any court having jurisdiction thereof. The place of arbitration shall be New York City unless mutually agreed upon elsewhere by CSX and Maersk. This Agreement and any arbitration under this Article shall be governed by the laws of the State of New York with the exception of the rules of conflict of laws thereof, and except as governed by the federal maritime law of the United States.

## Casualties

### CSX HAWAII  Voyage 183E

The HAWAII was built in 1973, was classified by ABS, was of 21,688 GRT, and had an LOA 203.69m, a breadth of 27.44m and a draft of 11.134m. On January 18, 2000, Maersk's stevedores completed loading its containers at Kaohsiung and the vessel departed for Tacoma. At 0710 on January 28, at an approximate position of Lat. 48.00N Long. 147.33W, while reportedly encountering Beaufort Force 9-10 winds, the vessel reportedly experienced a severe 45-50 degree roll in heavy seas and swells causing 21 containers stowed on the port side at No. 5 hatch to go over the side. The vessel arrived at Tacoma on January 30.

### CSX PACIFIC Voyage 136E.

The PACIFIC was built in 1979, was classified by ABS, was of 28,095 GRT, and had an LOA of 247.89m, a breadth of 27.44m and a draft of 10.059m. The vessel diverted to Kobe at Maersk's request to load a container that had been previously discharged from a Maersk vessel damaged by fire. On January 27, 2000, Maersk's stevedores completed loading its containers and the vessel departed for Tacoma. Sometime during the morning of January 31 at an approximate position of Lat. 47.97N Long. 176.25E, while reportedly encountering Beaufort Force 9 winds, the vessel reportedly experienced a severe 45 degree roll in heavy seas and swells causing 20 containers stowed on the port side at No.12 hatch to go over the side. The vessel arrived at Tacoma on February 5, 2000.

**CSX DISCOVERY Voyage 225E**

The DISCOVERY was built in 1968, was classified by ABS, was of 18,888 GRT, and had an LOA of 213.51m, a breadth of 25.91m and a draft of 9.78m. On December 12, 2000, Maersk's stevedores completed loading its containers at Kaohsiung and the vessel departed for Tacoma. At 0400 on December 17, at an approximate position of Lat. 38.07N Long. 167.40E, while reportedly encountering Beaufort Force 9 winds, the vessel reportedly experienced a severe 40-45 degree roll in heavy seas and swells causing 16 containers stowed on the starboard side at No. 11 hatch and the hatch cover itself to go over the side. The vessel arrived at Tacoma on December 25.

**Maersk's Contentions**

Maersk contends COGSA was fully incorporated in the Contract and that under COGSA and the general maritime law, a shipowner has a non-delegable duty to load, stow, and discharge the cargo and accordingly bears the risk of doing so properly. However, in private carriage, it is understood the parties can negotiate and agree on language shifting the duty and risk from the shipowner to the charterer. It is argued that wording such as the cargo shall be "loaded, stowed and discharged free of risk and expense to the vessel" may be sufficient to shift the risk of improper stowage to the charterer, however, Maersk asserts the Contract contained no such language or any wording remotely approaching the kind necessary to shift the risk.

Maersk asserts that CSX's position that there was only a "partial incorporation of COGSA" because the incorporation clause did not specifically mention "loading" or "stowage" is a tortured interpretation of the Contract that clearly intended to fully incorporate all the terms and provisions of COGSA. If the parties intended to shift responsibility for loading and stowage, Maersk contends it would have been a simple matter to include such wording in the Contract. Maersk submits there is no such wording in the Contract.

Maersk further submits that its payment of stevedoring charges does not in and by itself shift responsibility for loading and stowage to the paying party or to allocate the risk of improper stowage to the paying party. Maersk maintains CSX's crew and

6

management understood its responsibility to insure proper stowage but failed to execute its duty to do so. Maersk points out that its stevedores merely developed and provided preliminary stowage plans but it was the ship's officers that made the final stowage decisions.

It is Maersk's position that CSX bears full and sole responsibility for any stowage-related issues. While CSX argues the containers were lost because the stack weights exceeded the allowable weights set forth in the Container Securing Manual ("CSM"), Maersk contends the actual stow plans did not create excessive forces and that the containers were not lost because of improper stowage. Maersk asserts the losses were caused by the vessels' design and related operational problems compounded by the improper maintenance of the cargo securing systems.

In summary, Maersk contends the vessels were not seaworthy for the intended voyages and maintains the crews failed to properly care for their cargo.

## CSX's Contentions

CSX maintains COGSA does not apply to the Contract of its own force and that the Contract only partially incorporates COGSA as a contractual term. More specifically, CSX argues that the parties only incorporated three of the seven enumerated COGSA carrier duties in the Contract, omitting the duties related to "loading" and "stowing". CSX contends that where a shipowner's COGSA duties to load and stow are inapplicable, as here, the charterer is liable for improper stowage.

CSX submits that Maersk is responsible for the faults of the loading stevedores because this was a "free in" charter arrangement. As Maersk was responsible under the Contract to arrange and pay for the loading and stowage of its containers, CSX maintains Maersk, therefore, bears responsibility for any cargo loss and/or damage caused by improper loading and stowage. It is argued that the Maersk stevedores caused the losses because the containers that went overboard were loaded in stacks that exceeded the CSM designated allowable weights. CSX submits the ships' officers didn't know the tiers were

overloaded and, in any event, didn't have the obligation or the time to check and correct the stevedores' loading mistakes.

CSX maintains it did not cause or contribute to the losses. CSX contends the ships' securing fittings were in proper order and that the ships' equipment was well maintained.

CSX refers to COGSA, and other Contract provisions, which it contends exculpate it from responsibility for the lost containers. To the extent heavy weather or the extreme rolling of the ships contributed to the containers going overboard, CSX contends it is not liable under COGSA or the Contract because the adverse weather was a peril of the sea or a circumstance beyond CSX's control.

## Discussion and Decision

Article 7.1 of the Contract provides that "[T]he carriage, custody and care of goods hereunder shall be subject to . . COGSA". CSX's principal argument on the application of COGSA in its entirety to the losses in question is that the COGSA incorporation clause referred to is nothing more than a partial incorporation of COGSA. As Article 7.1 does not specifically mention "loading" or "stowing", CSX asserts the stowage obligation rests with Maersk.

It is well established that COGSA and its burdens of proof may be fully incorporated in a private contract of carriage.[1] The majority concludes that Article 7.1 fully incorporates all of the terms and conditions of COGSA, including its burdens of proof and CSX's non-delegable duty of proper stowage. Section 1303(2) provides:

> The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

The Contract is concededly a private contract of carriage freely negotiated by the management and legal teams of two of the industry's leading and most knowledgeable owners and operators of container vessels. Parties to a private contract of carriage incorporating COGSA are, of course, free to modify the terms of COGSA, shifting the

---

[1] *La Libertad,* 529 F.Supp 78 (S.D.N.Y. 1981); *The Rodosto,* SMA 2222 (1986); and *The Jo Anne,* SMA 3026 (1993). Also see Pare, "The Burden of Proof in Cases of Cargo Loss and Damage Where the U.S. Carriage of Goods By Sea Act Has Been Incorporated into a Charter Party", 25 Tulane Maritime L.J. 491 (2001).

fundamental responsibilities of the statute as they wish. This would obviously include an agreement to delegate the risk and responsibility for loading and stowage of cargo in a manner that is different and inconsistent with the express provisions of COGSA. However, clear and explicit language would be required to do so. [2] For instance the authors of *Voyage Charters* (3rd Ed. 2007) in addressing what would be required to shift the common law responsibility for loading and discharge away from the carrier state:

> A consensual transfer is required and a mere exclusion clause will not suffice to protect the carrier. There is always a need for clear words if there is to be a transfer of the obligations to load, stow and discharge from owners to cargo interests. The incorporation into a bill of lading of the terms of a charterparty which state that loading, stowage and discharge are to be carried out by the "charterers/shippers/receivers" will suffice, although not merely that they shall pay the financial cost of those operations, e.g. "FIOS". [3]

and;

> Since the responsibility for loading and discharging operations within the ship, and for stowage, is normally that of the owner, clear words are necessary to transfer the responsibility for these operations to the charterer.
>
>    *      *      *      *      *
>
> A clause which makes the charterer responsible for the expense of employing stevedores to perform loading, stowage or discharging does not, without more, transfer responsibility. [4]

If the parties intended to shift the responsibility for loading and stowing from CSX to Maersk, they could have easily accomplished it by inserting specific language to that effect. There is no clause or term in the Contract remotely expressing an intention to shift this responsibility. CSX's Chief Operating Officer who negotiated the Contract was unable to point to any language suggesting the responsibility for stowage was shifted to Maersk.

Quite apart from its argument on the partial application of COGSA, CSX contends that the risk of proper stowage shifted from CSX to Maersk because Maersk

---

[2] *Nichimen Co. v. M/V Farland*, 462 F.2d 319, 330 (2d Cir. 1972) citing American and English authorities.
[3] Section 85.110.
[4] Section 14.55.

paid for the loading and stowage of its cargo. It is CSX's position that the Contract "free in" arrangement placed on Maersk not only the expense of loading but also the risk caused by improper loading and stowage so long as CSX did not actively intervene. Again we recognize that the parties could have negotiated a clause that stated the cargo was to be loaded and discharged "free of risk and expense to the vessel" and this would have served to shift the risk of improper stowage from the shipowner.[5] However, the Contract contained no such language. The mere payment of loading expense, in and by itself, does not serve to allocate the risk of loading to the party paying the expense. [6]

CSX has argued that the Maersk stevedores improperly loaded containers in positions that exceeded CSM requirements and that Maersk, therefore, bears responsibility for the loss of containers occasioned by the faulty stowage. CSX has argued that the ships' officers did not have the duty or the time to check and correct the stowage. The mates testified that the stowage plans were given to the vessels at the last minutes prior to departure and that there would have been hours of delay sailing the vessels if the ships' officers had to check and satisfy themselves that the stowage was proper. The argument bears no merit. The ships' officers fully understood that the responsibility for proper stowage was theirs. This obviously included the responsibility for checking stack and tier weights and ensuring that they were within acceptable limits. In fact, CSX's Chief Operating Officer testified that CSX's policy required the ships' officers to verify stack and tier weights and correct any violations before allowing the vessel to sail. The safety of the vessel and its crew remains paramount so a delay of a few hours, if necessary to check the stevedores' preliminary stow plans, is a requirement that cannot be minimized or ignored.

We now address CSX's contention that the heavy weather and extreme rolling of the ships, which CSX alleges contributed to the loss of containers, constituted COGSA defenses for "perils, dangers and accidents of the sea" as broadened by the Contract's

---

[5] See *The La Cordillera*, SMA No. 2728 (1990); *The Tai Ning*, SMA No. 3568 (1999); and *The Macado*, SMA No. 3684 (2001).
[6] See *Sucrest Corp. v. M/V Jennifer*, 455 F.Supp. 371 (D. Me. 1978) and its citation and commentary in *Voyage Charters, supra* at Section 11.119 stating, "Whereas an FIO term merely encompasses responsibility for payment of loading and discharge costs, an FIOST clause will have the effect of transferring responsibility for stowage and trimming from the owner to the charterer."

*force majeure* provision, Article 10. CSX's expert testified that the heavy rolls caused by synchronized or parametric rolling were entirely unexpected and a classic example of an "accident of the sea" for which COGSA affords a defense.

The question of whether a peril of the sea exists is dependent upon the specific facts of each case, however, the general guidelines require conditions which are of an extraordinary nature, force or power which cannot be guarded against by ordinary skill and prudence. Also of importance in this determination is whether the weather conditions were foreseeable given the time of the year and area being transited.

All three incidents occurred on North Pacific crossings during January and December. Expert testimony has established the adverse nature of the prevailing weather conditions with Beaufort Force 8-10 winds and heavy seas. However, the testimony clearly establishes to the panel's satisfaction that the weather was expectable for a North Pacific crossing during the winter months of January and December and certainly not so extraordinary as to overcome a well founded ship. The majority concludes CSX has failed to establish a peril of the sea defense.

In summary, the majority concludes that the Contract incorporated COGSA in its entirety and that Maersk has established by a fair preponderance of the evidence that the containers were delivered to CSX in good order and condition and were subsequently lost at sea. Maersk need not prove how the loss or damage occurred. Once Maersk has established its *prima facie* case, the burden shifts to CSX to prove that it exercised due diligence to make the vessel seaworthy and that the loss was due to one or more of the Contract's excepted perils. CSX's defense falls into two basic categories; firstly, Maersk was responsible for stowing its containers and that its stevedores improperly loaded the vessels; and secondly, that the loss was occasioned by a peril of the sea or *force majeure*.

The majority concludes both defenses are insufficient and that CSX bears responsibility for the containers lost on the three voyages in question. Mr. Arnold's dissent is set forth in Appendix A.

11

**Damages**

Cargo interests presented claims for damages for the three casualties itemized below in the total amount of $6,098,459.29. Maersk settled the claims that were not time barred for a total of $3,065,752.48, as summarized below:

| Vessel | Claims | Settlement |
|--------|--------|------------|
| CSX HAWAII | $1,372,586.92 | $ 767,500.49 |
| CSXPACIFIC | 2,180,144.89 | 1,051,503.00 |
| CSX DISCOVERY | 2,545,727.48 | 1,246,748.99 |
| Totals | $6,098,459.29 | $3,065,752.48 |

Maersk settled the Nike cargo claims at 100% based on the terms of its service contract with Nike. However, Maersk recognizes that CSX is not bound by that service contract and, therefore, only seeks recovery of 50% of the Nike settlements. This is in line with its overall range of settlements with other cargo interests.

Maersk's claim in this proceeding is accordingly reduced to the following:

| Vessel | Claims |
|--------|--------|
| CSX HAWAII | $ 662,610.92 |
| CSX PACIFIC | 1,051,503.00 |
| CSX DISCOVERY | 969,989.33 |
| Total | $2,684,103.25 |

CSX acknowledges that Maersk settled all the claims arising out of the three voyages in question and concedes that the majority of the settlements were reasonable. CSX specifically objects to six claims for the reasons set forth below:

- CSX contends Maersk paid more than it should have on four of the Nike claims because the settlements were based on retail value, which included lost profit, rather than on a CIF valuation.
- With respect to HAWAII claim No. 7, CSX contends Maersk should have applied the number of pallets for limitation purposes rather than the number of cartons. Maersk settled this claim for $235,000 whereas CSX contends the reasonable value based on the package limitation amount would be $70,000.
- On the DISCOVERY claim No. 6, CSX objects to the $170,000 settlement because it asserts that the bill of lading incorporated U.S. COGSA, therefore, the

COGSA package limitation of $105,000 should apply. CSX argues that it should not be liable for the higher Canadian Hague-Visby package limitation since it was Maersk's election to ship to Canada.

We should now address the limited objections that CSX has raised with respect to the settlements described above. With respect to the Nike settlements, we should note that COGSA does not limit a cargo valuation to CIF terms. There is sufficient authority to allow us to conclude that a settlement based on a retail valuation, including lost profit, is an acceptable basis of settlement under COGSA. The cost of litigating the differential relating to profit would not make economic sense. We conclude the Nike settlements were reasonable.

The propriety of the HAWAII settlements turns upon the question of whether Maersk should have treated pallets as the basis of the package limitation rather than the number of cartons. There is a split of authority on this point, so the question we should address is whether the settlement was reasonable. Given the conflict on this point of law, it most probably would have required litigation to resolve it. The cost of litigating this issue would simply have been more expensive than the benefit to be gained. It would have been foolhardy to do so. We accept the HAWAII settlement as a fair and reasonable disposition of the claim.

The DISCOVERY settlement revolves about the propriety of Maersk settling the claim based upon a package limitation in excess of the COGSA limit. The container in question was destined to Canada and the bill of lading reflected this destination. Clearly, COGSA does not apply to Canadian shipments so the COGSA package limitation is irrelevant. Canadian Hague-Visby would apply to the shipment and there is no package limitation under Canadian Hague-Visby. The fact that containers consigned for discharge in the U.S. Pacific Northwest are destined for Canada should not be of any surprise to CSX. We conclude the Maersk settlement was fair and reasonable.

### CSX's Counterclaim

CSX's counterclaim for damages relates to the cost of repairing the three vessels involved in the casualties. Having concluded CSX bears responsibility for the loss of

13

containers on the three voyages in question, it follows that CSX's counterclaim is denied.

**Fees and Costs**

The Panel has considered all of the facts and circumstances, the nature and value of the claims and counterclaims, the relative level of effort, the reasonableness of the expenditures and the level of success of the prevailing party. Based upon our analysis of the above criteria, the Panel majority concludes that Maersk is entitled to an allowance of $347,873.00 towards its attorneys' fees and costs, which is included in the award below. The allocation of the Panel's fees and expenses are addressed in Appendix B which is made a part of this Final Award.

**Interest**

Interest is awarded at the weighted averaged prime rate as published by JP Morgan Chase Bank from January 1, 2002 to the date of this award.

**Award**

CSX is directed to pay Maersk the sum of $4,020,868.22 calculated as follows:

| | |
|---|---|
| Indemnity for cargo claim settlements | $2,684,103.25 |
| Interest | $  963,923.98 |
| Attorneys' fees and costs | $  347,873.00 |
| Arbitrators' fees and costs | $    24,967.99 |
| Total due Maersk | $4,020,868.22 |

If payment is not made within 30 days from the date of this Final Award, interest at the rate of 6.50 % per annum will resume accruing on the principal indemnity amount until the award shall be satisfied or reduced to judgment, whichever first occurs.

This Final Award may be made a rule of the Court in accordance with Article 11 of the Contract

_____

Manfred W. Arnold
(Dissenting)

_____

Jack Berg

_____

David W. Martowski,
Chairman

New York, New York
January 30, 2008

15

Appendix A

---

In the Matter of the Arbitration

between

MAERSK SEALAND
as Charterer

and

CSX LINES, LLC,
as Owner

under a Space Charter and Transportation
Service Contract dated December 9, 1999

: Dissent

---

I respectfully disagree with my fellow arbitrators as to the ultimate conclusions

reached as well as the resultant damages awarded.

I agree with the statement contained in the main body of the award[1] that,

> The Contract is concededly a private contract of carriage freely negotiated by the
> management and legal teams of two of the industry's leading . . . parties to a
> private contract of carriage incorporating COGSA are, of course, free to modify
> the terms of COGSA, shifting the fundamental responsibilities of the statute as
> they wish.

However, I disagree with the majority's conclusion[2]

> . . . that the contract incorporates COGSA in its entirety and that Maersk has
> established by a fair preponderance of the evidence that the containers were
> delivered to SCX in good order and condition and were subsequently lost at sea.
> Maersk need not to prove how the loss or damage occurred. Once Maersk has
> established its prima facie case, the burden shifts to CSX to prove that it

---

[1] At p. 8.
[2] At p. 11.

*exercised due diligence to make the vessel seaworthy and that the loss was due to one or more of the Contract's excepted perils.*

My disagreement with the majority's findings is two-fold; (1) I do not accept that COGSA should apply to this CoA in toto and (2) I do not accept that Maersk has met its burden of proof required under a private contract of carriage.

- **Application of COGSA.**

My disagreement with the majority opinion is the very narrow issue whether COGSA should apply in its entirety or whether, as I contend, there should be a limited application of COGSA under this private carriage of contract and the language contained therein.

The majority states:

> *It is well established that COGSA and its burdens of proof may be fully incorporated in a private contract of carriage. The majority concludes that Article 7.1 fully incorporates all of the terms and conditions of COGSA, including its burdens of proof and CSX's non-delegable duty of proper stowage.*[3]

and then continues,

> *The Contract is concededly a private contract of carriage freely negotiated by the management and legal teams . . . . Parties to a private contract of carriage incorporating COGSA are, of course, free to modify the terms of COGSA, shifting the fundamental responsibilities of the statute as they wish.*[4]

It is evident that the majority acknowledges the possibility that COGSA may be included in toto or in part, depending upon the negotiations of the contract partners.

It is my position that under the private contract of carriage concept, the parties used specific and limiting language specifically to describe the agreed-to responsibilities

---

[3] At p. 8.
[4] Supra.

3

of the Owner, namely, "the carriage, custody and care of goods." It does not state "...
load, handle, stow, carry, keep, care for, and discharge the goods carried."[5] Why indeed
should it, as Maersk undertook to load, stow, secure and discharge the cargo.

The majority cites from <u>Voyage Charters</u> (3rd Ed. 2007), Section 85.110,[6] which is
preceded by the omitted introductory sentence, "It is reasonably, although not entirely,
clear what is required. . . ." Furthermore, the cases relied upon by the authors in
Sections 14.55 and 85.110 are English cases and, in my opinion, stand in direct
contradiction to the accepted rules of contract interpretation. While it may be useful for
New York to look to English decisions when there is no body of existing law in this
country on this point, one should certainly not simply embrace those decisions because
they are out there. In my opinion, this is a case of contract interpretation where words
should be understood in the plain and normal meaning. In this case, the contract
language and the conduct of the parties complement each other and indeed give effect
to the intention of the parties.

The majority opinion expresses the view that,

> *If the parties intended to shift the responsibility for loading and stowing from
> CSX to Maersk, they could have easily accomplished it by inserting specific
> language to that effect."*[7]

I concur with the majority's observation. Considering that the CoA was
negotiated by lawyers, it certainly lacks the absolute clarity one should have expected

---

[5] Section 1303(2) of COGSA.
[6] At pp. 8-9.
[7] At p. 9 of the award.

4

for a long-term and complex contract. Unfortunately, it did not happen, and we are left with the words contained in the CoA. I also noted the qualifying language used by Maersk's counsel; in the main brief[8] that CSX's argument concerning the partial incorporation of COGSA was "a tortured interpretation of a clause which was **obviously intended** to fully incorporate COGSA." In the reply brief, Maersk argues[9] that "**Fairly read,** the Contract imposes responsibility for stowage on CSX." (emphasis added in bold) If indeed the intent was so obvious, why are the parties having this arbitration? The language and the particular words used in the contract are what they are; they are clear and without ambiguity. Clause 2, which defines the scope of the CoA, states:

> The purpose of this Agreement is for CSX Lines, LLC **to charter space to, and transport cargo and containers** for Maersk Sealand and to document the parties' co-operation set out herein. (emphasis added in bold)

Article 7.1 provides that, The **carriage, custody and care of goods**. . . . (emphasis added in bold)

The language as presented in the CoA leads me to conclude that Maersk not only agreed to pay for the loading, stowing and discharging of the cargo, but also to assume the risk.

I recall a statement in <u>Simpson on Contracts</u>, which reflects my sentiments, that ". . . it is the intention that is expressed in the Contract that controls, not an intention secretly cherished by one of the parties."

---

[8] At p. 8.
[9] At. p. 4.

5

- **The Burden of Proof.**

Since the CoA is a private contract of carriage, the provisions of COGSA do not
apply by virtue of the statute, but are merely contractual terms which can and were
altered by the agreement of the parties to the CoA. By its express terms, COGSA does
not apply to the CoA itself and thus does not interfere with the adjustment of risk and
stipulation of rights and obligations between CSX and Maersk delineated in the CoA.[10]
If indeed the application and force of COGSA would be the same in a private contract of
carriage and a contract of common carriage, then what would be the purpose of
negotiating exculpatory clauses into a contract? If COGSA automatically would render
mutually negotiated contract terms null and void, then why would or should parties
bother to negotiate specific clauses? Contract clauses, waiving or restricting a
shipowner's obligation of seaworthiness or exculpating the owner from liability for loss
or damage caused by the negligence of the master and crew, have been considered valid
agreements consistent with the long established view that parties to a contract of
private carriage are free to adjust the risk of cargo damage or loss.[11]

The panel majority has stated that the burden is upon CSX to prove that it
provided a seaworthy vessel. I disagree with both the statement and the conclusion. In

---

[10] *46 U.S.C. (SECTION) 1305 (1964). This is not to say that COGSA or the Harter Act may not be made a
contractual term of a charter party. Both of these acts may be effectively incorporated into a charter party even
where they do not automatically apply or where no bills of lading are actually issued. See* United States v. Wessel,
Duval & Co., *115 F.Supp. 678 (S.D.N.Y. 1953);* The Ferncliff, *22 F.Supp. 728 (D.Md. 1938), aff'd, 105 F.2d 1021
(4th Cir. 1939); also, Tulane Law Review Vol. 45, No. 4 June 1971 "Charter Parties in Relation to Cargo" Anthony
N. Zock.*

[11] See *Commercial Molasses Corp. v. New York Tank Barge Co., 314 U.S. 104 (1941);* Horn v. Cia de Navegacion
Fruco, S.A., *404 F.2d 422 (5th Cir. 1968);* Coastal States Petrochem. Co. v. Montpelier Tanker Co., *1970 A.M.C.
1183 (S.D. Tex. 1970); H. Longley, Common Carriage of Cargo note 25, § 2.02.*

6

the MARINE SULPHUR QUEEN,[12] it was held that the burden of proving breach of

private carriage contract or of negligence by the carrier is on the shipper. In *Voyage*

*Charters*,[13] the authors stated:

> *The potential importance of who has the burden of proof is perhaps best*
> *illustrated by cases arising from the unexplained loss of the vessel. The leading*
> *case of this type is* <u>Commercial Molasses Corp. v. New York Tank Barge Corp.</u>,
> *314 U.S. 104 (1941). A barge loaded with molasses sank in New York harbor.*
> *After reviewing the evidence, the trial court found as a fact that "the cause of the*
> *accident has been left in doubt."* <u>Id.</u>, *at 107. As a result of this finding, the*
> *outcome of the claim for cargo loss turned on whether the owner or charterer had*
> *the burden of proof as to the cause of the sinking. The Supreme Court noted that*
> *were the case on involving a claim under a bill of lading for common carriage,*
> *the burden would be on the carrier to show that the loss was due to an excepted*
> *cause and not a breach of his duty to exercise due care to make the vessel*
> *seaworthy. But as the claim arose under a contract of Affreightment for private*
> *carriage, the situation was quite different. As stated by the court: "In such a*
> *case the burden of proving the breach of duty or obligation rests upon him who*
> *must assert it as the ground of the recovery which he seeks . . . ." (314 U.S. at*
> *110)*

In the discussion of COGSA and the effects upon common and private carriage,

Professor Thomas J. Schoenbaum writes:[14] "At common law, distinctly different legal

consequences attached to common and private carriage," which confirms that indeed a

different standard must be applied when dealing with these concepts.

Charterer has argued that ". . . the losses in this case were not caused by

problems with the loading plans"[15] and that ". . . the losses were caused by design and

---

[12] C.A.N.Y. 1972, 460 F.2d 89, cert. denied 93 S.Ct. 318, 409 U.S. 982, 34 L.Ed. 2d 246.
[13] Julian Cooke, John D. Kimball, Timothy Young, David Martowski, Andrew Taylor, LeRoy Lambert, Voyage Charters (London: Lloyd's of London Press Ltd., 2007, Sec. 11.143 at p. 246.
[14] Thomas J. Schoenbaum, Admiralty and Maritime Law (St. Paul, Minn." West Publishing Co., 1987), p. 293.
[15] Main brief at p. 17.

7

operational problems with the vessel itself, as well as improper maintenance of the vessel's cargo securing system."[16]

Counsel concludes that "... the undisputed facts demonstrate that the vessels were not seaworthy for their intended voyages and/or that the vessel's [sic] crews had an utter disregard for their obligations to care for the cargo...."[17] These contentions are not supported by the evidence, as only Maersk containers, loaded, stowed and secured by its subsidiary and/or contract stevedores were lost at sea, while all other containers carried for others by the CSX vessels and loaded, stowed and secured by other stevedoring entities, while using the same or similar cargo-securing systems as available on board, remained in stow and were safely carried and delivered.

It is also notable that Charterer, having argued that the container losses were attributable to the design and characteristics of the vessels, apparently did not investigate the problems and make requests for corrections or relief as a consequence of the three incidents. In the post-hearing briefs, Owner made reference to a fourth vessel in the CoA, the CSX CRUSADER, which experienced a similar incident when "containers broke stow but did not go overboard." Surveyors for CSX and Maersk weighed the containers and found some of them in excess of the bill of lading weights.

Under my interpretation of the burden of proof, as applicable to this particular case, it is not sufficient to show, as Maersk argues and the majority finds, that the cargo was delivered in good order and condition and not discharged/delivered in like good

---

[16] Main brief at p. 21 referring to the CSX HAWAII.
[17] At p. 27 of the main brief.

8

order. Maersk must prove that the actual fault of the carrier was the cause of the damage, which, under this contract with the partial incorporation of COGSA, it has not done.

In view of my conceptual disagreement with the majority's findings, I do not concur with the award of damages (indemnity for cargo claim settlements and interest) or the uneven allocation of attorneys' fees/costs as well as arbitrators' fees.

_____
Manfred W. Arnold

New York, New York
January 30, 2008

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In the Matter of the Arbitration
      between

Maersk Sealand,
      as Charterer,                            **Appendix B**

     and

CSX Lines, LLC,
      as Owner,

under a Space Charter and Transportation
Service Contract, dated December 9, 1999.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The Panel's fee is in the total amount of $101,900.00. The distribution is itemized below. The schedule reflects the individual fees of the arbitrators, the allocation of the fees as between the parties, the application of the escrow deposits and interest thereon, the credits due Maersk and the amounts owed by CSX.

| ARBITRATOR | TOTAL FEE | MAERSK SHARE 20% | CSX SHARE 80% | MAERSK ESCROW PAYS | CSX ESCROW PAYS | MAERSK CREDIT | CSX DEBIT |
|---|---|---|---|---|---|---|---|
| Manfred Arnold | $33,500.00 | $6,700.00 | $26,800.00 | $14,964.84 | $14,969.86 | $8,264.84 | $11,830.14 |
| Jack Berg | $33,200.00 | $6,640.00 | $26,560.00 | $14,964.84 | $14,969.86 | $8,324.84 | $11,590.14 |
| David Martowski | $35,200.00 | $7,040.00 | $28,160.00 | $15,418.31 | $15,423.49 | $8,378.31 | $12,736.51 |
| TOTAL | $101,900.00 | $20,380.00 | $81,520.00 | $45,347.99 | $45,363.21 | 24,967.99 | $36,156.79 |

In summary, we have credited Maersk with $24,967.99 in our award recapitulation for the arbitrators' fees it has paid in excess of its allocated share. In addition CSX is obliged to pay each arbitrator the sum indicated in the last column of the above schedule. The balance of fees due the arbitrators is to be paid within 30 days of this award, otherwise interest at 6.5% p.a. will be assessed against the outstanding sum from the date of the award until payment is made.

Liability for the panel's fee is a joint and several obligation.

# Exhibit B

Meehan Affidavit in Support

# HAWAII . PACIFIC . DISCOVERY

*It 15*

EXECUTION COPY

## SPACE CHARTER AND TRANSPORTATION SERVICE CONTRACT
### between
### A.P. Møller – Maersk Sealand
### and
### CSX Lines, LLC

**Article 1:**     **Name.**

The name of this Agreement is Space Charter and Transportation Service Contract (the "Agreement").

**Article 2:**     **Purpose.**

The purpose of this Agreement is for CSX Lines, LLC to charter space to, and transport cargo and containers for Maersk Sealand and to document the parties' co-operation set out herein.

**Article 3:**     **Parties.**

The names and addresses of the Parties are the following:

    (1)    CSX Lines, LLC ( "CSX")
             6000 Carnegie Boulevard
             Charlotte, North Carolina 28209
             USA

    (2)    A.P. Møller as managing owner for and on behalf of Aktieselskabet Dampskibsselskabet Svendborg and Dampskibsselskabet af 1912, Aktieselskab trading as Maersk Sealand ("Maersk")
             50, Esplanaden
             DK-1098 Copenhagen
             Denmark

CSX and Maersk are hereinafter collectively referred to as the "Parties" and each individually referred to as a "Party".

**Article 4:**     **Scope.**

Maersk represents that it is an ocean common carrier in United States foreign commerce and CSX represents that it is a water carrier in the U.S. non-contiguous domestic trade which operates vessels with voyages between the United States West Coast Ports referred to immediately below, Hawaii and the Territory of Guam on one hand and the Far East Ports of Hong Kong and Kaohsiung, Taiwan on the other, and vice-versa, all as more particularly set out in the Service proforma for the Trade attached hereto as Appendix 2,



EXHIBIT
tabbies.

I-NY/1066923.2

TPI Agreement
Maersk Sealand / CSX Lines LLC

Maersk desires to charter space aboard certain of CSX's vessels and purchase transportation services for carriage of cargo transported by Maersk under its bill of lading as an ocean common carrier in United States foreign commerce as more fully set forth herein.

The geographic scope of this Agreement shall cover the foreign trade, handled by Maersk, between the United States ports in Tacoma, Washington; Oakland, California; Honolulu, Hawaii; and the Territory of Guam and U.S. inland and coastal points served via such ports, on the one hand, and Hong Kong and Kaohsiung, Taiwan and inland and coastal points served via such ports on the other hand.

This Agreement shall also cover the domestic trade, handled by CSX, between the Jones Act corridors shown on Appendix 1-A attached hereto. For purposes of this Agreement, the Jones Act trade shall be deemed to be all trade lanes shown on Appendix 1-A, other than those which comprise the TP1 Service, as that term is defined in Article 5.1.1 below. The foregoing geographic scopes is referred to herein as the "Trade".

Provided however that the parties understand and agree that during the initial five (5) year term of this Agreement, CSX will not offer a common carrier service in the foreign portion of the Trade, i.e. the portion of the trade between the United States ports in Tacoma, Washington; Oakland, California; Honolulu, Hawaii; and the Territory of Guam and U.S. inland and coastal points served via such ports on the one hand, and Hong Kong and Kaohsiung, Taiwan and inland and coastal points served via such ports on the other hand. Provided further that Maersk during the initial five (5) year term of this Agreement will not offer a common carrier service in the domestic portion of the Trade, i.e. the portion of the trade referred to as the Jones Act corridors as shown in Appendix 1-A.

Article 5:    The Charter and Charter Hire

5.1.1    Asia-U.S. West Coast.

CSX shall charter to Maersk, and Maersk shall charter space (on a take or pay basis) from CSX for a period of five years from the effective date of this Agreement, equivalent to nine hundred and ten (910) forty foot equivalent units ("FEUs") from the marine terminals, at Maersk's option, located in Kwai Chung, Hong Kong or Kaohsiung, Taiwan and the marine terminals at the U.S. West Coast ports shown in Appendix 2, per weekly sailing, used or unused, in the Trade on vessels employed by CSX in the weekly TP1 service (the "TP1 Service"), at a rate of $486.20 per FEU. Maersk shall have the right to use available space on CSX's vessels sailing between Kaohsiung and Hong Kong for way-port cargo.

To the extent that additional capacity is from time to time available, Maersk shall have the right, but not the obligation, to charter from CSX additional space in the Trade on the TP1 Service at the rates set out on Appendix 1-A attached hereto.

TP1 Agreement
Maersk Sealand / CSX Lines LLC

5.1.2    Guam – Asia.

At the option of Maersk, CSX shall carry any FEU, up to but not exceeding nine
hundred and ten (910) FEU, shipped from Guam to Asia via the TP1 Service,
pursuant to the immediately above provision, free of charge, provided, however,
that in such case, Maersk shall be liable for all loaded terminal charges in Guam.

5.1.3    Hong Kong/Kaohsiung.

Both Parties shall work together in good faith and use their respective reasonable
best efforts to oppose any attempt (or to cause the repeal of any successful
attempt) by any governmental or regulatory authority to prohibit by law,
regulation or order CSX's vessels from calling at either the Hong Kong or
Kaohsiung terminal. If, however, any governmental or regulatory authority does
prohibit by law, regulation or order CSX's vessels from calling at either the
Hong Kong or Kaohsiung terminal on the basis of such vessels' age, flag or
substantially similar characteristics, then the Parties shall negotiate in good faith
to agree upon other Asian ports to substitute for Hong Kong or Kaohsiung, as
the case may be. If after ninety (90) days the Parties are unable to agree on such
alternative arrangements, Maersk may terminate the TP1 Service with respect to
the Asia-U.S. West Coast tradelane only by delivery of a written notice to such
effect to CSX, which termination shall become effective sixty (60) days after
receipt of such notice. During such ninety (90) and sixty (60) day periods,
respectively, the slot rates or the obligation to purchase slots shall be adjusted if
the vessels cannot be utilized up to the full nine hundred and ten (910) FEUs.

At Maersk's option, with respect to FEUs in the Asia-U.S. West Coast tradelane
purchased under the TP1 Service, there shall be substituted for Hong Kong or
Kaohsiung any other port, provided, however,
(a)    each of CSX's vessels operating in the TP1 Service pursuant to this
       provision shall, after calling at Guam, and before returning the U.S. West
       Coast, call at least one port not located in the United States, and be able to
       continue to meet vessel schedule reliability for the remainder of the service
       in the Trade;
(b)    CSX shall be entitled to increase its rates for Charter Hire payable by
       Maersk hereunder for all FEUs subject to this provision to reflect fully all
       increases in CSX's costs related to the substitution of another port for
       Hong Kong or Kaohsiung (including, without limitation, increased port
       charges), and
(c)    CSX may make reasonable modifications to its Service proforma schedule
       for the TP1 Service attached hereto as Appendix 2 to reflect such
       substitution.

5.1.4    Delivery of FEUs to Asia.

TP1 Agreement
Maersk Sealand / CSX Lines LLC

During the term of this Agreement, CSX shall deliver to Maersk in Asia an average of nine hundred ten (910) FEUs of containers per week (such containers to be tendered to CSX by Maersk pursuant to the Equipment Interchange Agreement set forth in Appendix 3 hereto), and such delivery shall be made in multiple installments reasonably distributed throughout each calendar year. During each calendar quarter, CSX shall provide a minimum of eleven thousand five hundred (11,500) FEU containers to Maersk in Asia provided an equal number of containers are tendered to CSX by Maersk in accordance with terms of the Interchange Agreement set forth in Appendix 3 hereto. If CSX does not provide such minimum, subject to exception for force majeure, CSX shall indemnify Maersk for all additional costs incurred by Maersk as a result of such shortfall.

5.1.5    Empty Costs

All empty costs in Hawaii or Guam and all loading costs (except such full loading or unloading costs associated with containers moved for the account of Maersk) at all Maersk's terminals located on the West Coast of the continental U.S. shall be borne by CSX, and all empty costs in Asia shall be borne by Maersk.

5.1.6    Deployment

During the five (5) year period of this Agreement, Maersk shall not deploy any vessels owned or operated by it or any of its corporate affiliates to the domestic offshore Jones Act ports served by the TP1 Service.

It is agreed that during the term of this agreement, CSX shall not issue a Bill of Lading, transport cargo, otherwise act as an ocean common carrier or otherwise compete with Maersk's international line business in the Foreign trade. Notwithstanding the foregoing, in the event Maersk terminates this agreement, CSX may sell the Asia-North America space to a common carrier other than Maersk, but may not itself issue a bill of lading, or otherwise act as an ocean common carrier in the foreign portion of the Trade.

5.1.7    Accounting

(a)    CSX shall, within five working days of the end of each month, bill and forward invoices for the preceding month with full supporting vouchers to Maersk when space is sold to Maersk. All invoices shall be billed in United States Dollars ("USD").

Maersk shall verify, accept or dispute the charges within ten (10) working days from receipt of invoices.

TP1 Agreement
Maersk Sealand / CSX Lines LLC

In satisfaction of the debts outstanding Maersk shall pay to CSX in such due time that the amount due is received by CSX no later than by the end of the same month. No deductions shall be permitted for amounts in dispute, save for those mutually agreed upon in writing.

(b) In order to allow CSX to continue its current repayment of construction differential subsidy payments required under the Merchant Marine Act, 1936, as amended, Maersk shall provide CSX with a calculation of the amount of the gross revenue derived by Maersk from each CSX vessel which is not twenty-five (25) or more years of age on an annual calendar year, per-vessel basis, and shall cooperate with any audit of such information requested by the U.S. Maritime Administration.

## 5.2   U.S. Surface Transportation Board Transportation Service Contract

### 5.2.1   Tacoma/Oakland/Hawaii

CSX agrees to transport non-U.S. domestic cargo for Maersk (on a take or pay basis) of 50 FEUs per week in the TP1 Service between the Tacoma, Washington or Oakland, California terminals operated by Maersk and CSX's Honolulu, Hawaii terminal, for a period of five (5) years following the effective date of this Agreement at rates defined in Appendix 1-A hereto.

### 5.2.2   Jones Act Corridor Rates

With respect to any of the Jones Act trade lanes indicated on Appendix 1 attached hereto, Maersk may tender, and CSX shall sell such number of slots to Maersk as indicated in Appendix B for a period of five (5) years at rates per FEU as indicated on Appendix 1 A, subject to volumes not exceeding past practice.

### 5.2.3   Waiver of Rights and Remedies Under ICC Termination Act

For purposes of this Article 5.2, the transportation contract made hereunder is entered into pursuant to the authority under Chapter 141 of the ICC Termination Act of 1995, 49 U.S.C. 14101(b). CSX and Maersk waive all rights and remedies under Part B of Subtitle IV, title 49, United States Code for the transportation covered by this Article 5.2; provided, however, that the Parties do not waive the provisions governing registration, insurance, or safety fitness.

### 5.2.4   Rate Adjustment

The Jones Act Corridor rates during the initial two (2) year period of this Agreement shall be adjusted only in the event of fuel cost increases, which occur after June 1, 1999. Such adjustments shall be applied to all Jones Act Corridor rates in all years in which they occur.

TP1 Agreement
Maersk Sealand / CSX Lines LLC

The Jones Act Corridor rates for each of the following three (3) years of this Agreement shall be calculated based upon the initial Jones Act Corridor rates and adjusted upward for specific quantifiable cost increases (e.g. labor, fuel and port charges) incurred, but in no one year shall exceed a five percent (5%) annual increase over the initial Jones Act Corridor rates.

During the entire term of this Agreement, fuel cost increases will be applied to all Jones Act Corridor base rates in any and all years in which they are incurred. In the event that the industry ratio of young to senior union labor changes (and thus the wage portion of the operating category) and such change has a direct effect on a specific Jones Act vessel, the Jones Act Corridor rate(s) shall be adjusted to reflect such effect.

If fuel cost increases result in an annual Jones Act Corridor rate increase exceeding five percent (5%) in a specific year, then such extra-ordinary increase will, on an exceptional basis, be applied to the Jones Act Corridor rates.

5.3     International Slot Commitments

5.3.1   Dominican Republic
If Maersk does not commit to a majority of international slots (based on past performance) to/from Dominican Republic, then Maersk and CSX shall reconsider CSX's continued coverage of Dominican Republic to/from New York and Houston and CSX shall have the right to discontinue its service to or from Dominican Republic.

In the event CSX decides to discontinue its service to/from Dominican Republic, CSX shall provide Maersk with minimum of sixty (60) days notification prior to discontinuing the service.

5.3.2   Bahamas and Puerto Rico
If Maersk does not commit to a reasonable amount of international slots (based on past performance) between Freeport, Bahamas and Puerto Rico, then CSX may sell such slots to another international carrier, but may not act as a common carrier or in other way compete with Maersk's international liner business in the Trade.

Article 6:     Operations

6.1     Reliability Commitment.

CSX agrees that, in each calendar quarter, at least eighty percent (80%) of all vessels carrying FEUs shipped pursuant to the TP1 Service departing their points of embarkation in such quarter will arrive at their intended points of disembarkation On Schedule (as defined below) (the "Reliability Commitment").

TP1 Agreement
Maersk Sealand / CSX Lines LLC

A vessel shall be deemed to arrive On Schedule if, subject to Article 10, such vessel arrives at its point of disembarkation at or before the time twelve hours following the time shown for such arrival on CSX's Service proforma schedule attached hereto as Appendix 2 in effect for the TP1 Service, as the same may from time to time be amended.

If CSX breaches the Reliability Commitment in any calendar quarter, and such breach is not due to any fault of Maersk or any of its affiliated companies, Maersk may deliver a notice of warning to CSX. If, following receipt of such warning by CSX, CSX breaches the Reliability Commitment during any two future calendar quarters, and such breach is not due to any fault of Maersk or any of its affiliated companies, then the Parties shall negotiate in good faith to reach alternative arrangements that preserve the economic benefits to each party contemplated by the TP1 Service. If after ninety (90) days the Parties are unable to agree on such alternative arrangements, Maersk may terminate its participation in the TP1 Service by delivery of a written notice to CSX to such effect, which termination shall become effective sixty (60) days after receipt of such notice.

6.2    Service Adjustments

CSX shall consult with Maersk prior to any temporary or permanent adjustment(s) in sailing schedules, port calls, itineraries or otherwise of the service in the Trade. If, after such discussions and considerations the Parties fail to agree on an appropriate adjustment and should CSX subsequently decide to discontinue sailings to a specified port on the current itinerary, then CSX shall give Maersk a minimum of three (3) months' prior written notice before the discontinuation takes effect. Within thirty (30) days upon receipt of such notice, Maersk may either:

(a)    terminate this Agreement by delivery of a written notice to CSX or;

(b)    adjust number of slots purchased from CSX equivalent to number of FEUs lost due to sailing adjustment.

In the event CSX provides an alternative sailing within the geographic scope of this Agreement to/from a specified port on the then current itinerary that has been eliminated, then CSX shall provide and Maersk may purchase space and tender cargo to CSX for transportation on the replacement sailing on the same terms and conditions as originally provided herein.

Not withstanding the foregoing, in the event that CSX must temporarily dry-dock a vessel engaged in the Trade hereunder, CSX shall deploy a substitute vessel to the Trade during the period of such dry-docking. In the event the capacity of the substitute vessel differs from that of the dry-docked vessel,

7

TP1 Agreement
Maersk Sealand / CSX Lines LLC

Maersk shall have the following options individually, in combination or collectively:

(a) utilize an allocation of capacity equal to ninety one percent (91%) of the substitute vessel, but shall have no obligation which exceeds its applicable commitment, in FEU's, hereunder and shall only pay for actual used FEU's, or;

(b) utilize an equivalent number of slots CSX may make available for Maersk containers on the subsequent sailing at no cost to Maersk or;

(c) arrange its own alternative transportation, and not pay slot cost to CSX for the Maersk containers affected.

6.3     Port Bypasses and Port Time Adjustments.

Except as provided elsewhere herein, CSX shall make day-to-day decisions regarding whether any port should be by-passed, port times adjusted or any other day-to-day operational matter involving the service in the Trade.

In the event any decision to by-pass a port or not to load or discharge Maersk's containers;

- is due to a force majeure occurrence as defined in Article 10 or;
- is due to port related delays in Hong Kong, Kaohsiung, Tacoma or Oakland caused by Maersk or its affiliates, contractors or agents. In this connection port delays shall be limited to an hour-to-hour basis, i.e. an one hour delay caused by Maersk or its affiliates, contractors or agents in one of the above ports will allow CSX to reduce portstay in one of the other of above ports by one hour only

then Maersk shall remain fully responsible to CSX for all its obligations under this Agreement including payment of all compensation for space provided to it.

In the event any decision to by-pass a port or not to load or discharge Maersk's containers;

- is not due to a force majeure occurrence as defined in Article 10, and;
- is not due to port related delays in Hong Kong, Kaohsiung, Tacoma or Oakland caused by Maersk or its affiliates, contractors or agents; or
- is due to port delay in Hong Kong caused by CSX or its affiliates, contractors or agents' non-performance,

then Maersk has the following options;

TPI Agreement
Maersk Sealand / CSX Lines LLC

(a) accept an offer by CSX to provide alternate water service for the Maersk containers affected, in which CSX will hold Maersk harmless from all increased operational costs occurring as a consequence of such by-pass. Operational costs shall include, but not be limited to, increased stevedoring, shiftings between alternate terminals and/or additional transshipment costs or;

(b) utilize an equivalent number of slots CSX may make available for Maersk containers on the subsequent sailing at no cost to Maersk or;

(c) arrange its own alternative transportation, and not pay slot cost to CSX for the Maersk containers affected.

### 6.4 Subcharters.

It is agreed that Maersk shall not subcharter space hereunder to any other ocean common carrier without the prior written consent of CSX.

### 6.5 Separate Identities.

Each Party shall retain its own separate identity and shall have separate sales, pricing and marketing functions. Maersk shall issue its own bills of lading. The parties will not discuss rates charged to each parties respective customers.

### 6.6 Equipment Interchanges.

The Parties may discuss and agree on standards for, and may interchange, purchase, pool, lease, sublease or otherwise co-operate in connection with containers, chassis and other equipment as among themselves, on such terms as they may agree from time to time. Such co-operation to be agreed upon in a separate Equipment Interchange Agreement attached hereto as Appendix 3.

### 6.7 Container Services.

CSX shall insure that its vessel personnel will, in accordance with instructions to be communicated from time to time by Maersk to CSX, during voyages when CSX transports containers on behalf of Maersk pursuant to the terms of this Agreement, maintain and repair such containers (and in particular for refrigerated containers, also monitor, and if so requested by Maersk, record temperature on such refrigerated containers). Except as may otherwise be specifically agreed between Maersk and CSX, Maersk will reimburse CSX for actual, documented expenses incurred as a direct result of the performance of such maintenance and/or repair which reimbursements shall be made within the time agreed by Maersk and CSX following completion of each voyage.

### 6.8 Administrative Matters

1-NY/1066922.2

TP1 Agreement
Maersk Sealand / CSX Lines LLC

Procedures for booking vessel container space, documentation, special cargo handling instructions or requirements, and other administrative matters relating to chartering and transportation provided under this Agreement shall be as the parties may from time to time agree in writing.

6.9    Origin and Destination of Cargo

Maersk may not use space chartered hereunder or tender cargo for carriage which either party is not permitted to transport under applicable law or regulations.

Article 7:    Liabilities and Indemnities.

7.1.    The carriage, custody and care of goods hereunder shall be subject to the Hague Rules, 1924, as enacted in and interpreted under the United States Carriage of Goods by Sea Act, 1936 ("COGSA"), as amended from time to time. However, only insofar as it may provide greater rights to Maersk, the provisions of the International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading signed at Brussels, August 25, 1924 as amended by the "Protocol" signed at Brussels, February 23, 1968 (VISBY RULES) and at Brussels, December 21, 1979 (S.D.R. Protocol) shall apply to goods whether carried on or under deck, to carriage of goods between U.S. ports, between non-U.S. ports and between U.S. and non-U.S. ports before the goods are loaded on and after they are discharged from the vessel and throughout the entire time the goods are in the custody, care and/or control of CSX, whether acting as carrier or bailee

For the purposes of determining any limitations of liability available the descriptions, weights, numbers/packages and customary freight units indicated in the Maersk Bill of Lading is sued to its customers shall be deemed conclusive and binding as between Maersk and CSX.

7.2.    As between the parties, CSX shall have the same rights, defences, limitations, and exoneration as Maersk has to or against its shippers in relation to goods transported under this Agreement, but CSX shall also be bound by the determination of a competent court the validity of such rights, defences, limitations and exoneration in any action between the shipper or other cargo claimant and Maersk. However, the liability of CSX (with the exception of costs and attorney fees whether incurred by Maersk or CSX) shall in no instance exceed (except as provided 7.4 below) the liability of Maersk to its shippers.

7.3.    Notwithstanding any other provision of this Agreement, CSX shall not be liable for, and shall be indemnified and held harmless by Maersk against, any loss or damage whatsoever resulting from or arising out of the incorrect issuance, completion or endorsement of bill(s) of lading by Maersk or its agent.

TP1 Agreement
Maersk Sealand / CSX Lines LLC

7.4.     The liability of CSX for any loss or damage to containers tendered to CSX by
         Maersk hereunder shall be the reasonable costs of repair or the value
         (replacement cost less depreciation) of the container at the time of such loss or
         damage, whichever is lesser, without reference to any limitation of liability.
         CSX shall not in any event be liable for any damage to a container, which does
         not exceed USD 250 on any voyage.

7.5.     Maersk shall indemnify CSX against any expenses, legal liabilities, loss,
         damage, claims or demands (and all reasonable expenses connected therewith,
         including reasonable attorney's fees, costs and expenses) which CSX may incur
         or suffer by reason of any failure by Maersk to comply with any relevant laws,
         regulations, directions, or notices of customs, port and any other authorities, or
         by reason of any infestation, contamination, or condemnation of goods or
         container, insofar as such failure, infestation, contamination or condemnation
         arises from any act, neglect or default of Maersk or of the consignors or
         consignees of any goods or containers transported under this Agreement, their
         servants or agents.

         CSX shall indemnify Maersk against any expenses, legal liabilities, loss,
         damage, claims or demands (and all reasonable expenses connected therewith,
         including reasonable attorney's fees, costs and expenses) which Maersk may
         incur or suffer by reason of any failure by CSX to comply with any relevant
         laws, regulations, directions, or notices of customs, port and any other
         authorities, or by reason of any infestation, contamination, or condemnation of
         goods or container, insofar as such failure, infestation, contamination or
         condemnation arises from any act, neglect or default of CSX or of its consignors
         or its consignees, , their servants or agents.

7.6.     Nothing in this Article or contained elsewhere in this Agreement is intended to
         be, or shall be construed to be, a waiver by either party of its right to limit
         liability under any applicable convention, treaty, statute of law in respect of fire,
         collision or otherwise.

7.7.     If requested by Maersk, CSX undertakes to make available to Maersk such
         documents of any form which Maersk may reasonably require for the handling
         of or in connection with any claims, actions, suits by or against Maersk. This
         would include protests, receipts, interchanges, survey reports, statements of
         facts, bay plans, log books, manuals.

7.8.     Maersk shall be entitled to handle and settle claims for loss of, damage to,
         misdelivery of or delay in delivery of cargo filed under and pursuant to its Bill
         of Lading or other contract of carriage, and shall further be entitled to grant such
         reasonable time extensions as Maersk deems necessary. Such handling and/or
         granting of time extensions shall not in any way prejudice Maersk's rights of
         recovery as against CSX hereunder.

TP1 Agreement
Maersk Sealand / CSX Lines LLC

7.9.    Notwithstanding anything herein or in the parties Bills of Lading to the contrary, any claim or action for indemnity by Maersk against CSX hereunder, shall be subject to 12 months' time bar counting from the time that Maersk has paid any settlement or from the date of any final judgement rendered by a competent court or unappealable award by arbitrators against Maersk.

Article 8:    Insurance

CSX shall assure that there is maintained in effect, as to its vessels, hull, P & I, war risk and financial responsibility for oil pollution insurance and provide the other party with satisfactory evidence of such insurance within thirty (30) days after the effective date of this Agreement. CSX further agrees to provide Maersk with written notice prior to any cancellation, non-renewal, or modification of such insurance.

Article 9:    Duration and Termination.

9.1.    The effective date of the Agreement shall be the day _____.    The Agreement shall remain in force for five (5) years from the effective date unless
(a)    terminated by the unanimous agreement of the Parties, or
(b)    terminated upon written notice with immediate effect for material default of one of the Parties which remains uncured for a period of thirty (30) days after written notice thereof has been received by the defaulting Party.
(c)    terminated by Maersk pursuant to Clause 6.1, Reliability Commitment, where termination of the TP1 Service shall constitute of a termination of the Agreement, whereas as a termination by Maersk of the Asia – North America tradelane pursuant to Clause 5.1.3, Hong Kong / Kaohsiung, shall not affect the remainder of this Agreement.

9.2.    Any unsettled matters, disputes, claims, actions, monies due or other obligations owed or due to each other hereunder shall survive any termination of this contract.

Any voyage of a vessel on which space is chartered to Maersk, or on which cargo is transported for Maersk by Sea-Land, which has commenced but has not been completed prior to the effective date of the termination of this Agreement shall be subject to the terms of this Agreement in its entirety.

Article 10:    Force Majeure.

Each Party shall be excused from the performance of any obligation imposed upon it under this Agreement, if and insofar and for as long as such performance is delayed or prevented by circumstances beyond its reasonable control including, but not limited to strike, lock-out or labour disputes, other work stoppages, fire, typhoon, hurricane, flood, explosion, natural catastrophe, act of God, military operations, blockade, sabotage, revolution, civil commotion, hostilities, war or civil war, governmental regulations or

TPI Agreement
Maersk Sealand / CSX Lines LLC

controls, participation in the U.S. Department of Defence Emergency Preparedness Program or other U.S. military national security agreements, or any similar event.

The Party concerned shall use all reasonable efforts to avoid or minimize the consequences of such failure to perform and shall continue to fulfil its obligations as far as possible after the cause of such failure has ceased to exist. In particular, the Party failing to perform any of its obligations shall immediately inform the other Party indicating the cause and expected duration of such failure and the delay which it will cause, and shall continue to keep the other Party informed of the situation.

Article 11:    Governing Law and Arbitration.

Any controversy or claim arising out of or relating to this Agreement, or the arbitrability of such controversy or claim, or the breach, termination or validity of the Contract, shall be settled by arbitration in accordance with the Rules of the Society of Maritime Arbitrators, Inc. (the "SMA"). Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party. The arbitrators so appointed shall appoint a third arbitrator, and the three arbitrators shall constitute the arbitration tribunal. The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. section 1-16, and judgement upon the award rendered by the tribunal may be entered by any court having jurisdiction thereof. The place of arbitration shall be New York City unless mutually agreed upon elsewhere by CSX and Maersk. This Agreement and any arbitration under this Article shall be governed by the laws of the State of New York with the exception of the rules of conflict of laws thereof, and except as governed by the federal maritime law of the United States.

Article 12:    Change of CSX ownership.

This Agreement shall survive a change in control of the ownership of CSX or of the change in ownership of CSX's vessels and assets engaged in the Trade, provided such change in control does not in any way affect the performance of CSX or its successor(s) under this Agreement.

Article 13:    Non-Assignment.

No Party may assign all or part of its rights and obligations under this Agreement without the prior written consent of the other Party. Should that consent be given it shall not affect any existing responsibilities and obligations under this Agreement, unless otherwise agreed.

Article 14:    Severability.

Should any term or provision in this Agreement be held invalid, illegal or unenforceable, the remainder of this Agreement, and the application of such term or provision to persons or circumstances other than those as to which it is invalid, illegal or unenforceable, shall

TP1 Agreement
Maersk Sealand / CSX Lines LLC

not be affected thereby; and each term or provision of this Agreement shall be valid and enforceable to the full extent permitted by law.

<u>Article 15:    Notices.</u>

For communication of all notices required pursuant to this Agreement, other than notice of termination which shall be sent by registered mail to the Parties, such other notices and communications shall be sent by first-class air mail (confirmed by telefax), by courier service, by E-mail or by telefax to the following:

    To:    Maersk Sealand
             50, Esplanaden
             1098 Copenhagen
             Denmark
             Att:    Line Department
             Fax :   +45 33 63 46 66
             E-mail :  cenlintop@maersk.com

    To:    CSX Lines, LLC
             2101 Rexford Road, Suite 350
             Charlotte, North Carolina 28211
             USA
             Att :    President
             Fax :   +1 (704) 973 7010

Any notice hereunder shall be effective only upon receipt.

TPI Agreement
Maersk Sealand / CSX Lines LLC

Signature Page

WHEREAS, the Parties have executed this Agreement on the _9TH_ day of _December_
_____, 1999.

CSX Lines, LLC

A.P. MØLLER as managing owner for and on
behalf of Aktieselskabet Dampskibsselskabet
Svendborg and Dampskibsselskabet af 1912,
Aktieselskab

By: _____

By: _____

Name: _____

Name: _V. LEHA MøLLER____

Title: _____

Title: _ERE V. P._____

I-NY/1066923.2

91 'd 500 'ON 12:51   10.91 7NL      2921712952:01                      SWIAT2

TP1 Agreement
Maersk Sealand / CSX Lines LLC

Appendix 1-B

## Declared Volumes for Jones Act Corridors

|  | Nos. FEU | Average weight |
|---|---|---|
| North America to Hawaii/Guam |  |  |
|    - TP1 Vessel Service | 50 FEU | 19.5 mts/FEU |
| Hawaii to Asia | 0 FEU |  |
| Guam to Asia | 0 FEU |  |
| North America to Alaska* | 0 FEU |  |
| North America to Puerto Rico or Dominican Republic* |  |  |
| From Elizabeth, NJ* | 0 FEU |  |
| From Jacksonville, FL* | 0 FEU |  |
| From Houston, TX* | 0 FEU |  |
| From Freeport, Bahamas (Puerto Rico only)* | 0 FEU |  |
| Hong Kong / Kaohsiung to North America |  |  |
|    - TP1 Vessel Service | 910 FEU | 17.0 mts/FEU |

Appendix 2

* Volumes cover full round trip basis

I-NY/1066923.2

TPI Agreement
Maersk Sealand / CSX Lines LLC

## Vessel Service Proforma

| PORT | ARRIVAL AT DOCK | | UNDOCKING TIME | | DAYS FROM TACOMA |
|------|-----|------|-----|------|------|
| | DAY | HOUR | DAY | HOUR | |
| Tacoma | | | SUN | 08:00 | 0 |
| Oakland | TUE | 08:00 | WED | 18:00 | 2 |
| Honolulu | SUN | 23:59 | TUE | 03:00 | 7 |
| Guam | TUE | 16:00 | WED | 04:00 | 16 |
| Hong Kong | SAT | 21:00 | SUN | 08:00 | 20 |
| Kaohsiung | MON | 05:00 | MON | 18:00 | 22 |
| Tacoma | FRI | 18:00 | | | 33 |

Note 1:    The above schedule is based on a roundtrip time of 35 days and a frequency
of 7 days.

1-NY/1066923.2

# Exhibit C

Meehan Affidavit in Support

IN THE MATTER OF THE ARBITRATION

- between -

MAERSK SEALAND, as Charterer,

- against -

CSX LINES, LLC, as Owner

Under a Space Charter and Transportation
Service Contract dated 9 December 1999

BEFORE: David Martowski, Chairman
Jack Berg
Manfred Arnold

## CHARTERER MAERSK'S PRELIMINARY
## STATEMENT OF CLAIM WITH EXHIBITS

Freehill Hogan and Mahar, LLP
Attorneys for Charterer Maersk - Claimant
80 Pine Street 24th Floor
New York, New York 10005
212 425 1900

Wayne D. Meehan *of counsel*
Gina M. Venezia, *of counsel*



## PRELIMINARY STATEMENT

This preliminary statement is submitted on behalf of Claimant-Charterer Maersk (hereinafter "Charterer" or "Maersk") in support of its claims against Respondent-Owner, CSX Lines (hereinafter "Owner" or "CSX"), under a Space Charter and Transportation Service Contract dated 9 December 1999 (hereinafter "Space Charter" or "Contract").[1] As outlined more fully below, Maersk's claims are essentially "pass through" claims related to settlements paid and expenses incurred by Maersk in regard to numerous cargo claims asserted against Maersk as the bill of lading issuer for containers which fell overboard on three separate voyages on CSX vessels. Maersk claims consist of the following, plus interest, costs and attorney's fees:[2]

| Vessel & Voyage | Approximate Voyage Date | Amount of Claim Without Interest |
|---|---|---|
| SEALAND HAWAII Voy. 183E[3] | January 2000 | $ 767,500.49 |
| SEALAND PACIFIC Voy. 136E | January 2000 | $1,051,503.00 |
| CSX DISCOVERY Voy. 225E | December 2000 | $1,076,748.99 |
| TOTAL CLAIMS: | | $2,895,752.48 |

## BACKGROUND

**A.    The Applicable Contract.**

In December 1999, Maersk and CSX entered into the Contract, the purpose of which was for CSX Lines to charter space to and transport cargo and containers for Maersk. (*See* **Exhibit 1:** Space Charter Contract). The charter party contained the following relevant clauses:

---

[1] This submission is without prejudice to Maersk's right to request a hearing, supplement this record with additional documents and/or make a request for documents to owner or others.

[2] Maersk also is claiming for its loss of containers. Evidence as to the value of the lost containers will be provided separately and will not be the subject of Mr. Messkoub's testimony at the first hearing.

[3] For ease of reference, we will refer to the vessels herein simply as the "Hawaii", the "Pacific" and the "Discovery", respectively.

Article 7: Liabilities and Indemnities

7.1: The carriage, custody and care of goods hereunder shall be subject to the Hague Rules, 1924, as enacted in and interpreted under the United States Carriage of Goods by Sea Act, 1936 ("COGSA"), as amended from time to time. However, only insofar as it may provide greater rights to Maersk, the provisions of the International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading signed at Brussels, August 25, 1924, as amended by the "Protocol" signed at Brussels, February 23, 1968 (VISBY RULES) and at Brussels, December 21, 1979 (S.D.R. Protocol) shall apply to goods whether carried on or under deck, to carriage of goods between U.S. ports, between non-U.S. ports and between U.S. and non-U.S. ports before the goods are loaded on and after they are discharged from the vessel and throughout the entire time the goods are in the custody, care and/or control of CSX, whether acting as carrier or bailee.

For the purposes of determining any limitations of liability available the descriptions, weights, numbers/packages and customary freight units indicated in the Maersk Bill of Lading issued to its customers shall be deemed conclusive and binding as between Maersk and CSX.

7.2: As between the parties, CSX shall have the same rights, defences, limitations, and exoneration as Maersk has to or against its shippers in relation to goods transported under this Agreement, but CSX shall also be bound by the determination of a competent court the validity of such rights, defences, limitations and exoneration in any action between the shipper or other cargo claimant and Maersk. However, the liability of CSX (with the exception of costs and attorney fees whether incurred by Maersk or CSX) shall in no instance exceed (except as provided 7.4 below) the liability of Maersk to its shippers.

7.3: Notwithstanding any other provision of this Agreement, CSX shall not be liable for, and shall be indemnified and held harmless by Maersk against, any loss or damage whatsoever resulting from or arising out of the incorrect issuance, completion or endorsement of bill(s) of lading by Maersk or its agent.

\*      \*      \*      \*

7.8: Maersk shall be entitled to handle and settle claims for loss of, damage to, misdelivery of or delay in delivery of cargo filed under and pursuant to its Bill of Lading or other contract of carriage, and shall further be entitled to grant such reasonable time extensions as Maersk deems necessary. Such handling and/or granting of time extensions shall not in any way prejudice Maersk's rights of recovery as against CSX hereunder.

Article 11:   Governing Law and Arbitration

Any controversy or claim arising out of or relating to this Agreement, or the arbitrability of such controversy or claim, or the breach, termination or validity of the Contract, shall be settled by arbitration in accordance with the Rules of the Society of Maritime Arbitrators, Inc. (the "SMA").   Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party. The arbitrators so appointed shall appoint a third arbitrator, and the three arbitrators shall constitute the arbitration tribunal.   The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. section 1-16, and judgment upon the award rendered by the tribunal may be entered by any court having jurisdiction thereof.   The place of arbitration shall be New York City unless mutually agreed upon elsewhere by CSX and Maersk.   This Agreement and any arbitration under this Article shall be governed by the laws of the State of New York with the exception of the rules of conflict of laws thereof, and except as governed by the federal maritime law of the United States.

**B.    The Subject Voyages.**

During 2000, Maersk chartered space on three vessels owned by CSX:  the HAWAII, the

PACIFIC, and the DISCOVERY.   Each of these vessels was en route to the United States West

Coast from Asia during the winter months (*e.g.* January 2000 and December 2000), when they

encountered adverse weather, which damaged certain containers and resulted in the loss of a

number of containers overboard.   Numerous cargo claims were asserted against Maersk as the

bill of lading issuer in the total amount of $6,219,892.85.   Some of the claims eventually became

time-barred, and Maersk settled all but one of the remaining claims.[4]   **(Exhibits 2 through 10**

contain documents related to Maersk's settlement of the various claims asserted on each voyage).

Maersk settled all of the claims for a total of $2,895,752.48 which are broken down as follows:

| Voyage | Amount of Claims | Amount of Settlement |
|---|---|---|
| Hawaii | 1,372,586.92 | 767,500.49 |
| Pacific | 2,180,144.89 | 1,051,503.00 |
| Discovery | 2,667,161.17 | 1,076,748.99 |
| Totals: | 6,219,892.98 | 2,895,752.48 |

---

[4] The open claim relates to the DISCOVERY and is currently pending in Canada, where both Maersk and CSX are named defendants.  (*See* Ex. L, claim no. 6).  Maersk reserves the right to recover against CSX once that claim is resolved.

(*See* **Exhibits 2, 4, & 6**: spreadsheets related to each voyage).

Maersk now seeks reimbursement from CSX for the amounts paid to settle the cargo claims, for which ultimate liability rests with CSX, as well as costs and expenses incurred in connection with settling the claims.

The specifics of each voyage are briefly summarized below.

### 1.    *The HAWAII*

The HAWAII is a MARAD Class C-6 containership built in 1972.  Her last load port before the subject Pacific crossing was Kaoshiung, Taiwan.  For most of the sea passage, the weather was stormy, but typical for the North Pacific in the wintertime. On January 28, 2000, just after 0700, the vessel lost 20 containers over the port side of #5 hatch, when the vessel was in approximate position Lat 48-00°N / Long 147-20°W.  Additionally, sixteen (16) containers were toppled onto the port and starboard hatch covers.  It was reported by the ship's crew that the vessel allegedly was experiencing Beaufort Force 9-10 wind conditions and took a 45° roll to port, when the containers fell overboard.  (*See* **Exhibit 11**: Hawaii deck log entries; **Exhibit 12:** Hawaii official log entries; **Exhibit 13**: Hawaii Stow Plan; **Exhibit 14**: USCG Form 2692).

### 2.    *The PACIFIC*

The PACIFIC is a MARAD Class C-8 containership built in 1968.  Her last load port before the subject Pacific crossing was Kobe, Japan.  For most of the sea passage, the weather was adverse, but again typical for the North Pacific in the wintertime.  On January 31, 2000, while the vessel was in approximate position Lat 47-57N/ Long 176-14.7E, the vessel lost 20 containers from the #12 hatch, port side.  At that time, the seas were running 20 to 25 feet and the wind was Beaufort Force 9.  It was reported that the vessel allegedly took a 45° roll when the

containers fell overboard. (*See* **Exhibit 15**: Pacific deck log entries; **Exhibit 16**: Pacific official log entries; **Exhibit 17**: Pacific stow plan; **Exhibit 18**: USCG Form 2692).

    *3.*      *The DISCOVERY.*

    The DISCOVERY is a MARAD Class C-7 containership built in 1968. She lost 16 containers over the side of #11 hatch on a voyage from Kaohsiung, Taiwan, to Tacoma, Washington, in late December 2000. There were no witnesses to this incident, but it was generally assumed that the loss occurred shortly after midnight on December 17, 2000, when the vessel (like the prior two vessels) allegedly took a 45° roll. At the time the containers were lost, the vessel had been experiencing Beaufort Force 8 conditions. Again, this is foreseeable weather for the North Pacific in December. (*See* **Exhibit 19:** Discovery deck log entries; **Exhibit 20**: Discovery official log entries; **Exhibit 21**: Discovery stow plans; **Exhibit 22**: USCG Form 2692).

**C.**    **Procedural Summary.**

    Pursuant to Article 11, Maersk demanded arbitration of CSX on May 3, 2002, with respect to each voyage and appointed Mr. Jack Berg as arbitrator. On May 20, 2002, CSX responded by appointing Mr. Manfred Arnold. Both parties requested that the arbitrators withhold from appointing a chairman as the parties attempted to negotiate a settlement. No resolution was reached by the parties, and on April 20, 2004, Maersk requested that a chairman be appointed. Mr. Martowski was selected as Chairman in August 2004, but after his appointment, the parties again attempted to negotiate a settlement of their disputes and asked the Panel to await the outcome of these discussions before proceeding. A resolution was not reached, and Maersk now desires to move forward with prosecution of its claims. The first hearing is scheduled for January 10, 2006.

**D.    CSX Counterclaims.**

Well after Maersk demanded arbitration, CSX asserted counter-claims with respect to each voyage for alleged physical damages to its vessels.[5]  CSX also requested counter-security regarding its counter-claims for vessel damage.  However, despite Maersk's requests, CSX has not provided any information to Maersk confirming the amounts allegedly paid by CSX for the purported repairs.  Further, it is clear that many of the damages for which CSX is claiming against Maersk concern areas of the vessels in which Maersk cargo was not carried.  Maersk, therefore, maintains that counter-security is not due for CSX's counter-claims, and in the alternative, CSX should be required to provide evidence of payment for the alleged repairs prior to any amounts for security being set.  Notably, CSX demanded that Maersk provide payment information in support of its claims when security was negotiated on the current LOU's issued in favor of Maersk.  Thus, CSX can hardly contend that the same information is not relevant to its claim for security.

**DISCUSSION**

The Contract between Maersk and CSX provides that the United States Carriage of Goods by Sea Act governs the rights and liabilities as between Maersk and CSX (see Exhibit 1, Article 7.1), thereby setting up a scenario whereby Maersk is a shipper  vis-à-vis CSX.  The shipper/carrier relationship is further confirmed in Clause 7.2, dealing with liabilities between the parties, which states that CSX has precisely the same defenses to cargo claims by Maersk as Maersk has to its customers:

> "As between the parties, CSX shall have the same rights, defenses, limitations, and exoneration as Maersk has to or against its shippers in relation to goods transported under this Agreement..."

---

[5]  CSX has also asserted a claim for vessel damage in regard to a voyage of the CSX CRUSADER, which dispute is not before this Panel.

(*See* Exhibit 1, Clause 7.2).

The obvious import is that CSX has only those defenses to claims by Maersk that Maersk has to its customers, *i.e.* Maersk is in a pass through position. (Of course, with the exception of those causes for which the Contract specifically states that CSX has no responsibility, *see, e.g.* Clause 7.3 stating that CSX is not responsible for damages resulting from Maersk incorrectly completing or endorsing bills of lading.)

The Contract further provides that Maersk is authorized to handle and settle claims for loss and damage without prejudice to "...Maersk's rights or recovery as against CSX hereunder." (Exhibit 1, Clause 7.8) Maersk concedes, however, that as a prerequisite to reimbursement from CSX, any such settlements must be reasonable, and consistent with all defenses available to Maersk (this is confirmed by Clause 7.2 which states that CSX can assert any defenses against Maersk which Maersk could have asserted against its customers).

With that contractual background, the issues in this case are two fold; first, whether the settlements which Maersk entered into were reasonable; and second, whether Maersk is entitled to reimbursement from CSX. The following is a brief discussion of each.

### 1.    The Settlements were Reasonable and in Fact, Favorable.

As explained above, this case involves damage and loss of containers. As the Panel is aware, a claimant makes out its *prima facie* case based on delivery to the carrier and non-delivery or damage at outturn. The burden then shifts to the carrier to show that the cause of the loss was due to one of the excepted perils outlined in the Carriage of Goods by Sea Act.

In the course of evaluating the claims, Maersk considered a possible defense based on peril of the sea. Generally speaking, a peril of the sea occurs when conditions "'are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be

guarded against by the ordinary exertions of human skill and prudence.'" *See Thyssen, Inc. v. S.S. Euronity*, 21 F.3d 533, 539 (2d Cir. 1994). It is a "fortuitous action of the elements at sea, of such force as to overcome the strength of a well-found ship or the usual precautions of good seamanship." *Taisho Mar. & Fire Ins. v. M/V Sea-Land Endurance*, 815 F.2d 1270 (9th Cir. 1987).

The determination of whether a peril of the sea exists is dependent on the facts of each case, and there is no general standard. *Id.* A very important factor considered in the analysis is the wind velocity on the Beaufort Scale because of the direct relationship between wind velocity and the size and shape of the waves. Very few cases have qualified for a peril of the sea where the winds are Force 9 or less. *J.Gerber & Co. v. S.S. Sabine Howaldt*, 437 F.2d 580 (2d Cir. 1971). However, "[n]o exact Beaufort Scale wind force can be referred to as the dividing line which will determine those cases in which a peril of the sea is present and those, below that mark, in which it is not." *Sabine Howaldt*, 437 F.2d 580 (2d Cir. 1971).

The ultimate conclusion turns on whether the weather conditions were foreseeable, given the location and time of the year. *Thyssen*, 21 F.3d at 539; *Taisho*, 815 F.2d 1270. If the weather was expectable, then no peril of the sea will be found. *The Sabine Howaldt*, 437 F.2d at 596; *Tecomar*, 765 F.Supp. at 1175. With this overriding principle, the courts have been very reluctant to find that adverse weather conditions constitute a "peril of the sea", and very few cases, especially in New York, have granted a carrier exoneration from liability based upon this defense.

Although the weather encountered by each of the vessels here was adverse to some extent, remaining between Force 8 and Force 10, the weather was certainly not unforeseeable for North Pacific winter crossings. Therefore, Maersk was pessimistic regarding its ability to

establish a peril of the sea defense. Under these circumstances, Maersk entered into settlement negotiations with the various claimants, and eventually settled the claims in the 50% range. Massoud Messkoub of Maersk will explain the circumstances surrounding the settlements, but Maersk maintains that the settlements were reasonable and indeed favorable, given the relatively bleak liability position, and the costs and uncertainty involved in going forward with the claim.

## 2. <u>Reimbursement from CSX.</u>

As explained above, the Contract authorized Maersk to settle the claims with its customers, and Maersk is entitled to reimbursement, provided those settlements are reasonable and consistent with any defenses which could have been asserted against Maersk's customers.

There is no legitimate dispute that cargo claimants made out their *prima facie* cases against Maersk. The cargo was loaded onboard the vessel, and either not delivered or delivered in damaged condition. Thus, Maersk has similarly made out its *prima facie* case against CSX and is entitled to reimbursement unless CSX proves that Maersk was unreasonable in settling the claims by not properly asserting any defenses against its customers. As will be shown, there were no legitimate defenses to the claims, the settlements were eminently reasonable, and Maersk is entitled to pass through those claims to CSX.

In reviewing this Contract, it is important to realize that it is not, as CSX contends, a garden-variety charter party (such as the New York Produce Exchange form) where charterer bears responsibility for stowage. Under the Carriage of Goods by Sea Act (which is incorporated as between Maersk and CSX pursuant to Clause 7.1), CSX, which is contractually in the position of "carrier" vis-à-vis Maersk, is responsible for the cargo:

> "The Carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."

46 U.S.C. §1303(2)

Under both COGSA and the common law, CSX' duty to load, stow and discharge the cargo is non-delegable. See, e.g., *Nishemen Co. v. M/V FARLAND*, 462 F.2d 319, 330 (2d Cir. 1972). This Panel is well aware that parties to a contract can agree to shift responsibility for stowage as between themselves. Indeed, this Panel is very familiar with the normal charter party scenario whereby responsibility for stowage (which is normally Owner's non-delegable duty) is contractually shifted to Charterers. *See, e.g.* New York Produce Exchange Form, Clause 8. Significantly, the Contract between Maersk and CSX in this case did not shift responsibility for stowage. Therefore, the duty to properly load and stow the cargo rests with CSX at all times, and therefore, CSX' arguments that the cargo was improperly stowed are legally irrelevant.

## CONCLUSION

Based upon the foregoing, and the additional evidence which will be submitted, Maersk submits that it is entitled to full reimbursement for the settlements paid and expenses incurred in connection with defending the cargo claims asserted against it arising out of the three subject voyages. Maersk is also entitled to interest on the settlement amounts from the date of payment, as well as its costs and attorneys fees.

Respectfully submitted,

Wayne D. Meehan
Gina M. Venezia
FREEHILL, HOGAN & MAHAR, LLP
80 Pine St.
New York, NY 10005
(212) 425-1900
Attorneys for Maersk


TO:    M.E. DeOrchis, Esq.
       DeOrchis & Partners
       61 Broadway - 26th Floor
       New York, N.Y. 10006

# Exhibit D

## Meehan Affidavit in Support

IN THE MATTER OF THE ARBITRATION

-    between -

MAERSK SEALAND, as Charterer,

-    against -

CSX LINES, LLC, as Owner

Under a Space Charter and Transportation
Service Contract dated 9 December 1999

BEFORE: David Martowski, Chairman
Jack Berg
Manfred Arnold

## CHARTERER MAERSK'S
## FINAL BRIEF

Freehill Hogan and Mahar, LLP
Attorneys for Charterer Maersk - Claimant
80 Pine Street 24th Floor
New York, New York 10005
212 425 1900

Wayne D. Meehan *of counsel*
Gina M. Venezia, *of counsel*



EXHIBIT
D

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

SUMMARY OF ARGUMENT .................................................................................. 1

FACTUAL SUMMARY ........................................................................................... 3

    A.    The Contract. ...................................................................................... 3
    B.    The Subject Voyages. ......................................................................... 5
    C.    Claims Presented Against & Settled by Maersk. ................................ 5

POINT I:

CSX BEARS LEGAL RESPONSIBILITY FOR THESE LOSSES—
THE RISK OF IMPROPER STOWAGE WAS NOT SHIFTED TO MAERSK. ......................... 6

    A.    COGSA Was Fully Incorporated. ...................................................... 6
           1.    There was no "partial incorporation." ................................... 8
           2.    Payment of stevedoring charges does not shift responsibility
                  to the paying party. ............................................................. 11

    B.    CSX Fully Understood Its Responsibility to Ensure Proper Stowage,
         but Failed to Do So. .......................................................................... 12
           1.    CSX crew and management understood
                  CSX was responsible for stowage. ...................................... 12

           2.    Maersk's appointed stevedores provided preliminary stow plans,
                  but vessel officers made the ultimate decisions regarding stowage. ......... 15

POINT II:

THE CONTAINERS WERE NOT LOST AS A
RESULT OF IMPROPER STOWAGE ............................................................................. 17

    A.    The Actual Stow Plans Did Not Create Excessive Forces. .................... 17

           1.    The CSM is a guide, representing but one acceptable loading pattern ...... 17
           2.    The actual stow plans created acceptable forces with
                  appropriate design criteria. ................................................. 19

    B.    The Individual Voyages. ..................................................................... 21
           1.    The Hawaii voyage. ............................................................ 21
           2.    The Pacific voyage ............................................................. 23

3.    The Discovery voyage. ..........................................................................24

4.    Conclusion ...........................................................................................27

**POINT III:**

MAERSK WAS A SHIPPER VIS-À-VIS CSX AND IS ENTITLED
TO REIMBURSEMENT FOR AMOUNTS PAID IN SETTLEMENT. ......................................27

A.    CSX is Liable Under the Contract, and
Maersk is Entitled to Reimbursement. ............................................................29

1.    Maersk has established a prima facie case of CSX's liability;
CSX's utter disregard for the care of the cargo. ........................................29

2.    CSX has not proven a defense. ..................................................................31

3.    CSX has failed to segregate the alleged causes of damage. ......................33

C.    The Settlements Were Reasonable and In Fact, Favorable. ..................................33

**POINT IV:**

CSX'S COUNTERCLAIMS SHOULD BE REJECTED. ...........................................................35

**CONCLUSION** ............................................................................................................37

## INTRODUCTION

Claimant-Charterer Maersk ("Maersk" or "Charterer") submits this brief in support of its claims against Respondent-Owner, CSX Lines (hereinafter "Owner" or "CSX"), under a Space Charter and Transportation Service Contract dated 9 December 1999 (hereinafter "Space Charter" or "Contract" or "TP1 Agreement").

## SUMMARY OF ARGUMENT

CSX's entire case is based on the assumption that Maersk bears the risk of improper stowage under the Contract – it does not. As individuals working in maritime claims, we are all of course familiar with situations where owners are responsible for unseaworthiness and charterers are responsible for stowage problems. This is common because certain frequently used charter party forms (such as NYPE) specifically shift responsibility for stowage from owners to charterers. The law is absolutely clear, however, that in the absence of such a clause, under both general maritime law and U.S. COGSA, the duty to ensure proper stowage, and the consequences of failing to do so, fall upon the ship and its owner – here, CSX. *See Nissho-Iwai Co. Ltd. v. M/T Stolt Lion,* 617 F.2d 907, 914 (2d Cir. 1980). Further, the law could not be clearer that by arranging for and paying for stevedore services, charterers do not relieve ship's officers of ultimate responsibility for proper stowage and do not accept responsibility for stowage.

Counsel for CSX seeks to create an inventive, after-the-fact issue that COGSA was only partially incorporated and argues that because the incorporation clause does not specifically mention "loading" or "stowing", the parties' intended for Maersk to be responsible for stowage. Maersk submits that the best evidence of a party's true understanding is the position taken early on, before involvement of counsel. Before this case proceeded to arbitration, CSX took the

1

position that COGSA governed – never mentioning the current "partial incorporation" theory. Indeed, although given an opportunity, the individual who negotiated the Contract on behalf of CSX could point to no language in the Contract which suggested that Maersk was responsible for stowage – he certainly did not endorse or even mention CSX's current "partial incorporation" theory.

In fact, the Contract does not shift responsibility to Maersk. On the contrary, the Contract incorporates COGSA which in clear and unequivocal terms places the stowage obligation on CSX. The vessel officers recognized their obligation to ensure that the vessels were loaded in accordance with principles of good seamanship and in compliance with the container securing manuals, which necessarily included the responsibility to verify that there were no stack or tier weight violations. CSX's Chief Operating Officer testified that as part of the Chief Mate's responsibility for the overall safety of the vessel, CSX policy required that the Chief Officer check the stack and tier weights and correct any deficiencies before allowing the vessel to sail. Yet, the officers onboard the HAWAII and PACIFIC did not comply with company policy and failed to check the stack and tier weights – an exercise which they conceded was essential to ensure the safety of the vessels, their cargoes and their crews.

For reasons which will be explained herein, the losses in this case were not caused by improper stowage. To the extent that there were causally-related stowage problems, however, responsibility rests squarely with CSX. In the final analysis, the Contract places responsibility for stowage on CSX, the law places responsibility for stowage on CSX, and CSX vessel personnel and management recognized their obligation to ensure proper stowage. Therefore, CSX's arguments regarding improper stowage are legally irrelevant and need not be addressed by the Panel.

The Contract places Maersk and CSX in a carrier-shipper relationship and specifically authorizes Maersk to settle underlying cargo claims without prejudice to Maersk's right to seek indemnification from CSX. Cargo interests presented claims to Maersk in 2001 and Maersk placed CSX on notice of the claims. There were no viable defenses, and CSX agreed with Maersk's decision to settle on best terms possible. Maersk proceeded to settle the claims and was able to settle the claims in the 50% range, which was extremely favorable given the bleak liability picture. Now, some 6 years later, CSX denies all responsibility for reimbursement, blaming Maersk for what CSX maintains were causally-related stack weight problems, in a context where their own employees failed to check those stack weights prior to sailing as is required by company policy.

The positions which CSX has taken in this case are legally unsupportable, and its posture throughout has been commercially unreasonable. Maersk is entitled to reimbursement from CSX of the amounts paid by Maersk to cargo interests for the failure of CSX to ensure the seaworthiness of the vessels and to care for the cargo. CSX's counterclaims for vessel damage should accordingly also be rejected.

## FACTUAL SUMMARY

### A.    The Contract.

In December 1999, Maersk and CSX entered into the Contract under which CSX chartered space to and transported containers for Maersk from Far East to U.S. West Coast ports. [Ex. 1; Keenan Tr. 659:4—665:22].[1]   CSX also transported containers pursuant to the Contract on its own behalf to and from the U.S. West Coast, Hawaii and Guam. [Keenan Tr. 665:16 – 666:8].

---

[1] The hearing testimony will be referred to herein by the witness' last name and "Tr." for the page reference to the hearing transcript. The page references are denominated by page:line – page:line.

The anticipated route under the Contract outbound from the U.S. was Tacoma, Hawaii, Guam, Hong Kong, and Kaohsiung. CSX World Terminals' stevedores loaded any cargo at Hong Kong, and APM Terminal stevedores loaded any cargo at Kaohsiung. [Keenan Tr. 712:24-713:7]. Maersk paid the stevedoring charges at Kaohsiung, but all lashing equipment (*e.g.* stacking cones, twistlocks, ISO sockets, etc.) was owned and maintained by CSX. [McDorr Tr. 344:18–345:9]. The vessel crew had ultimate control over whether any cargo could be loaded or how. [*See*, e.g., Ex. 60: Chief Mate Schaeffer Depo. pp. 21-22, explaining that he and captain decided that numerous containers could not be loaded at Kaohsiung]. In this connection, the crews had the duty to ensure that the stack and tier weights in each stow were not excessive, and if so, to lodge an objection or have the stow changed. [*See id.*; Bergin Tr. 418:21-419:3]. According to CSX's Chief Mate Schaeffer, the vessels would review the final stow plan and check it against the CSX container stowage manual. [Ex. 60: Schaeffer Depo. pp. 34-35].

The Contract also provided with respect to the parties' legal responsibilities that:

### Article 7: Liabilities and Indemnities

**7.1**: The carriage, custody and care of goods hereunder shall be subject to the Hague Rules, 1924, as enacted in and interpreted under the United States Carriage of Goods by Sea Act, 1936 ("COGSA"), as amended from time to time. ... .

For the purposes of determining any limitations of liability available the descriptions, weights, numbers/packages and customary freight units indicated in the Maersk Bill of Lading issued to its customers shall be deemed conclusive and binding as between Maersk and CSX.

**7.2**: As between the parties, CSX shall have the same rights, defences, limitations and exoneration as Maersk has to or against its shippers in relation to goods transported under this Agreement ....

[Ex. 1, Article 7].

There is no express language in the Contract similar to that used in the NYPE form which shifted legal responsibility for improper stowage to Maersk. [*See* Keenan Tr. 702:18 - 703:12].

**B.    The Subject Voyages.**

During 2000, while en route to the United States West Coast from Asia during the winter months, the HAWAII, the PACIFIC, and the DISCOVERY encountered adverse weather, resulting in damage to certain containers and the loss of a number of containers overboard. In January 2000, the HAWAII lost 20 containers over the port side at hatch #5 when the vessel allegedly took a 45° roll. The PACIFIC lost 20 containers at #12 hatch, port side, in January 2000, when that vessel also allegedly took a 45° roll. Finally, in December 2000, the DISCOVERY lost 16 containers at #11 hatch, when that vessel also allegedly took a 45° roll. The specifics of each voyage are discussed in more detail below in Point II.

**C.    Claims Presented Against and Settled by Maersk.**

Numerous cargo claims were asserted against Maersk as the bill of lading issuer in the total amount of $6,098,459.29. Some of the claims eventually became time-barred, and Maersk settled the remaining claims for a total of $3,065,752.48, as follows:

| Vessel / Voyage | Claims | Settlement |
|---|---|---|
| Hawaii | 1,372,586.92 | 767,500.49 |
| Pacific | 2,180,144.89 | 1,051,503.00 |
| Discovery | 2,545,727.48 | 1,246,748.99 |
| Totals: | 6,098,459.29 | 3,065,752.48 |

[*See* Exs. 2A, 4A & 6A: spreadsheets related to each voyage; and Exs. 2 – 10 containing documents related to Maersk's settlement of the various claims]. Based on the terms of a service contract, Maersk settled claims presented by Nike at 100%. Maersk recognizes that CSX is not bound by the terms of its service contract and is only seeking to recover 50% of the settlements

paid to Nike, *i.e.* the same percentage paid on the remaining claims. Taking into account the reduction in the Nike claims, Maersk now seeks reimbursement for the following amounts:

|  |  | Amount of Claim |
| Vessel / Voyage |  | Without Interest |
| Sealand Hawaii Voy. 183E |  | $ 662,610.92 |
| Sealand Pacific Voy. 136E |  | $ 1,051,503.00 |
| CSX Discovery Voy. 225E |  | $ 969,989.33 |
| Total: |  | $2,684,103.25 |

In addition, Maersk seeks interest, attorney's fees and costs.

### POINT I

### CSX BEARS FULL RESPONSIBILITY FOR THESE LOSSES – THE RISK OF IMPROPER STOWAGE WAS NOT SHIFTED TO MAERSK.

Throughout this arbitration, CSX has sought to establish the containers were lost as a result of improper stowage. For reasons which will be explained below in Point II, the containers were not lost due to improper stowage, but rather based on problems (design, maintenance and operational) with the vessels themselves. Significantly, however, the Panel need not reach this issue, since the outcome of this case is determined by the law which clearly establishes that responsibility for stowage and the risk of improper stowage rests squarely with CSX.

### A.    COGSA was Fully Incorporated.

Under COGSA and the general maritime law, a vessel owner has a non-delegable duty to load, stow and discharge the cargo and bears the risks and consequences for failing to do so. *See, e.g., M/T Stolt Lion*, 617 F.2d 907 (2d Cir. 1980); *Nichimen Co. v. M/V FARLAND*, 462 F.2d 319, 330 (2d Cir. 1972). In the private carriage/charter party context, the parties are free to negotiate and agree upon language which shifts this duty and the risks of such from the owner to

the charterer.  Any such allocation of the risk cannot, however, be based on a unilateral presumption or an assumption, but rather must be based on a fair interpretation of the charter party terms.  *M/V Sankosteel*, SMA No. 1182 (N.Y. Arb. 1975) (Devlin, Cedarholm, Georges); Gilmore, G. & Black, C., *The Law of Admiralty* §4-1 at 95 (2d ed. 1975) (a charter is merely a contract subject to all rules and requirements of law).

This Panel of course is familiar with common charter party clauses which shift the stowage responsibility from owners to charterers.  The classic example is Clause 8 of the New York Produce Exchange form which states that "the charterers are to load, stow and trim the cargo at their expense" (1946 form) – a specific clause which may shift primary liability for improper stowage to a charterer.  *Nichimen*, 462 F.2d 319. *But see The Union Spirit*, SMA No. 1854 (N.Y. Arb. 1983) (Arnold, Berg & Mordhorst) ("whereas the provisions of Clauses 8 and 58 provide for charterers to arrange for the loading and stowing of the cargo, the appointment of stevedores and the [financial] burden for this operation, the ultimate responsibility for the safety of the vessel and its cargo clearly remains the obligation of the vessel's master.").  A clause stating that cargo is to be "loaded, stowed and discharged *free of risk* and expense to the vessel" may also be sufficient to shift the risk of improper stowage to a charterer.  *See Nichimen*, 462 F.2d 319. (quoting the voyage charter).

Here, however, the Contract between Maersk and CSX contains no language even remotely approaching the type needed to shift the risk of stowage to Maersk.  On the contrary, Article 7.1 of the Contract incorporates COGSA which places responsibility for stowage on the carrier (in this case, CSX):

> The Carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

46 U.S.C. §1303(2).

Recognizing that there is no language shifting responsibility for stowage to Maersk, CSX makes two arguments in an effort to place responsibility for stowage on Maersk. First, CSX argues that since the clause incorporating COGSA does not specifically mention "loading" or "stowing," the stowage obligation rests with Maersk. Second, CSX argues that Maersk paid the stevedoring charges and therefore bears the risk of improper stowage. Both arguments fail.

### 1.    There was no "partial incorporation."

The Contract provides that "The carriage, custody and care of the goods hereunder shall be subject to ... COGSA..." [Ex. 1, ¶ 7.1]. For the first time since these incidents in 2000, CSX pointed out in its Pre-Hearing Statement that the incorporation clause does not specifically mention "loading" or "stowage." CSX argued that the failure to specifically mention "stowage" is an indication that the parties intended for the risk of improper stowage to rest with Maersk. This argument – though inventive – is a tortured interpretation of a clause which was obviously intended to fully incorporate COGSA.

It bears mention that this "partial incorporation" argument was raised for the first time after Eric Danoff was retained as co-counsel for CSX. (Mr. DeOrchis advised all parties of Mr. Danoff's retention by email dated October 27, 2005). As was explained by Mr. Tsukamoto, Senior Director and Counsel for Maersk Inc.'s Risk and Claim Management Department, in the prior settlement discussions conducted without outside counsel, CSX took the position that the rights and liabilities of the parties were governed by COGSA, with no mention of any "partial incorporation." [Ex. 69, Tsukamoto Decl., ¶ 5]. In fact, on November 9, 2004, in advance of scheduled settlement discussions between the parties, CSX's P&I representative sent an email in which he summarized CSX' position and understanding of the agreement as follows:

> We believe that the Maersk/CSX space charter should be considered a contract for private carriage which incorporates COGSA. It is our view that as Maersk arranged and paid for the loading, Maersk should bear the risks and consequences of improper loading....

[*Id.*].

In the subsequent meeting between Maersk, CSX and it's P&I Club in November of 2004, there was no suggestion that the incorporation of COGSA was in any way limited or that the "partial incorporation" was evidence that the parties intended Maersk to be responsible for stowage. The only argument raised was the argument outlined in the email set forth above, *i.e.* that since Maersk arranged and paid for the stevedores, Maersk should be responsible for any stowage issues. [*Id.* at ¶ 6].

The death knell to the "partial incorporation" theory came during Mr. John Keenan's testimony. By letter to the Panel dated October 16, 2006, Mr. DeOrchis advised that CSX was presenting the testimony of Mr. John Keenan who negotiated the Contract to testify about "... the negotiations leading up to the agreement as well as the intent of the parties...." Mr. Keenan testified before the Panel on October 24, 2006. At that hearing, Mr. Keenan was unable to point to any language in the Contract suggesting that responsibility for stowage was shifted to Maersk. His opinion that Maersk should be responsible for stowage was based solely on the fact that Maersk paid for and arranged the loading. [Keenan Tr. 702:13 – 703:12]. Certainly, he did not endorse the "partial incorporation" theory, and as the individual who negotiated the Contract on behalf of CSX, he did not see the significance of the "partial incorporation" which is now urged by counsel for CSX.

Predictably, CSX cites no authority for the notion that the parties to a charter must list all possible activities encompassed in an ocean transport for a valid COGSA incorporation to exist. Such a ruling would be contrary to the numerous opinions finding a valid COGSA incorporation

in charter parties, with less inclusive incorporation language than is contained in the Maersk/CSX contract. *See, e.g., The Jo Anne*, SMA No. 3026 (N.Y. Arb. 1993); *see also In Re T/B Florida*, SMA No. 3628 (N.Y. Arb. 5/25/00) (citing *Phillips 66 Co. v. Marine Specialties Co.*, SMA No. 3026 (N.Y. Arb. 1993); *California and Hawaiian S. Co. v. Columbia S.S. Co., Inc.*, 391 F.Supp. 894, 897 (E.D. La. 1972), *aff'd* 510 F.2d 542 (5th Cir. 1975); *Horn v. Cia de Navigacion Fruco, S.A.*, 404 F.2d 422 (5th Cir. 1968); *The Venture*, SMA No. 2681 (N.Y. Arb. 1990).

For example, in *The Jo Anne,* (Nichols, Winer, Martowski) the charter party contained a less inclusive incorporation clause than in the Maersk/CSX contract – "(b) The *carriage* of cargo under this charter party and under all bills of lading shall be subject to…" – and yet the panel found the language sufficient to incorporate COGSA in its entirety, stating as follows:

> …Clause 20(b) of the ASBATANKVOY charter party form incorporates COGSA into the charter party in its entirety as well as into the bills of lading issued pursuant to the charter and, as such, the parties' rights, duties and obligations with respect to carriage of the cargo are governed accordingly.

In the end, CSX's effort to ascribe an agreement to shift the risk to Maersk because of the absence of the words "loading" and "stowing" in Article 7 is unavailing. The Contract confirms CSX's duties as vessel owner. Article 7.1 unambiguously sets forth the parties' respective liabilities and states that U.S. COGSA governs the rights and liabilities as between Maersk and CSX. [Ex. 1, Article 7.1]. This language sufficiently incorporates COGSA in its entirety in the Charter, including its burdens of proof and the owner's attendant non-delegable duty vis-à-vis stowage. *See, e.g., The Jo Anne*, SMA No. 3026 (N.Y. Arb. 1993) (Nichols, Winer & Martowski); *The Rodesto*, SMA No. 2222 (N.Y. Arb. 1986).

If the parties intended to shift responsibility from CSX to Maersk, it would have been a simple matter to include such a clause in the Contract as is commonly done. There is, however, no such clause or term stating Maersk bears the risk of improper stowage, and it cannot be inferred that Maersk was intended to be responsible for stowage based on CSX's "partial incorporation" theory – clearly an after-the-fact, lawyer-generated argument regarding the parties' intent which is contrary to CSX's earlier position regarding the meaning of the Contract.

### 2. *Payment of stevedoring charges does not shift responsibility to the paying party.*

CSX's alternative argument – that the risk of stowage shifted because Maersk paid for the loading and stowage at Kaohsiung – is equally unavailing. As previously discussed, CSX Chief Operating Officer, Mr. John Keenan testified that his view that Maersk should be responsible for stowage was based solely on the fact that Maersk paid for and arranged the loading. [Keenan Tr. 703:8 – 703:12]. But payment of loading expenses, standing alone, is insufficient to allocate the risk of improper stowage to the paying party.[2] In its Pre-Hearing Statement (p. 7), CSX argued that the Contract between Maersk and CSX was "...like a free in arrangement" but a "free in" arrangement without more, merely obligates Maersk to pay the stevedores for loading and stowing the containers – it does not shift the risk of loading and stowing from CSX to Maersk. *See, e.g., Associated Metals & Minerals v. M/V Arktis Sky*, 978 F.2d 47, 49 (2d Cir. 1992) (holding that FIOS terms where shipper pays expenses of loading do not shift liability to the shipper for improper stowage); *Sucrest Corp. v. M/V Jennifer*, 455 F. Supp. 371 (D.Me. 1978)

---

[2] *See, e.g., M/V Sankosteel*, SMA No. 1182 (Devlin, Cederholm, Georges 1978); *see also In re Trans-Ocean Steamship Agency*, SMA No. 1689 (Reynolds, Cederholm, Evans 1982); *Lykes Lines Ltd. v. M/V BBC Sealand*, 398 F.3d 319, 327 (5th Cir. 2005) ("free in and out" provision "simply means that the vessel does not pay for the costs of loading, stowage or discharge"); *Goff and Page Co. v. S/S Fortune*, 182 F. Supp. 242 (E.D.Va. 1960) ("free in and out" meant that charterer required to pay normal loading and unloading charges); *Stemcor USA, Inc. v. M/V Archimedes*, No. 7864, 2004 U.S. Dist. LEXIS 25236, *11 (S.D.N.Y. May 4, 2004) (rejecting argument that plaintiff, by having arranged and paid for stevedores, became liable for their negligent stowage).

(FIO term understood to fix responsibility for payment of loading and unloading costs, not to transfer risk of loading and stowage, as in a FIOST carriage).

**B.    CSX Fully Understood It's Responsibility to Ensure Proper Stowage, but Failed to Do So.**

**1.    *CSX crew and management understood CSX was responsible for stowage.***

Chief Officers on CSX vessels clearly understood it was their responsibility to ensure proper stowage, including verification that stack weights were within acceptable limits. Mr. McDorr, the Chief Mate on the PACIFIC testified as follows:

> Q:    Is it fair to say that you perceive that you are responsible to ensure that the stow plan is appropriate and consistent with principles of good seamanship?
>
> A:    I do feel responsible for that, yes.
>
> Q:    Is it also fair to say that it's your responsibility to ensure that the vessel is being stowed in accordance with the trim and stability booklet and the cargo-securing manual?
>
> A:    Yes
>
> Q:    Again, that would include making sure that there were no stack weight violations, correct?
>
> A:    Yes
>
> Q:    And that would include making sure that there were no tier weight violations, correct?
>
> A:    I would feel responsible for it. Is it my responsibility not to load the hatch on with excessive stack weights; is that what you are saying?
>
> Q:    Let's forget about the word "responsibility." Did you understand it to be your duty to check to make sure that the stack weights were appropriate?
>
> A:    Yes.
>
> Q:    Did you understand it to be your duty to make sure that the tier weights were appropriate?
>
> A:    Yes.

[McDorr Tr. 350:10 – 351:14].

Similarly, Anthony Schaeffer, the Chief Mate onboard the DISCOVERY was well aware of his obligation to check the stow pattern; he testified at his deposition that he personally double-checked everything at Kaohsiung and that he would not have let the ship sail unless he personally double-checked everything. (Ex. 60: Schaeffer Depo. p. 13).

Finally, CSX management was aware that CSX was responsible for stowage. CSX's Chief Operating Officer, Mr. John Keenan reluctantly admitted on cross-examination that CSX's policy required ship's officers to obtain the information necessary to determine if there were stack or tier weight violations and correct any such violations before allowing the vessel to sail. In discussing the Chief Mate's responsibilities, Mr. Keenan testified as follows:

> Q:  His primary responsibility is the safety of the ship; is it not?
> A:  That is correct.
>
> Q:  Would you agree with me that it is imprudent to sail the ship unless a problem has been remedied with respect to stack weights or tier weights?
> A:  If he is aware of it.
>
> Q:  That is my question. If he is aware of it, isn't it true that CSX at the time and Horizon now expects him to change it and make sure that it is correct before the ship sails?
> A:  He would have to direct someone to change it.
>
> Q:  Right. And he would have to make sure that that change is, in fact, carried out before the vessel sails; is that correct?
> A:  That is correct.
>
> Q:  If the information is not available, as you have posited, isn't it his obligation to make sure that he gets the information so that he is sure that everything is proper before the vessel sails?
> A:  That is our preference.
>
> Q:  That is your policy, isn't it?
> A:  Yes.

[Keenan Tr. 707:25 – 709:3].

As part of their overall responsibility for the safety of the vessel, the ship's officers were required to check the stack and tier weights prior to sailing.[3]  Both the ship's officers and CSX management were aware of the need to check stack and tier weights prior to sailing and knew that any problems with the stack and tier weights would increase the forces on containers and securing gear, thereby increasing the risk of containers being lost. They were also aware that the CSX HAWAII and CSX PACIFIC did not have bilge keels and were susceptible to excessive rolling, which would exacerbate the risk of increased forces on securing gear resulting from excessive stack weights. Yet, the officers on board the CSX HAWAII and CSX PACIFIC did no such checks, and in fact, were not even aware if there were any stack or tier weights violations prior to sailing. (Chief Mate Schaeffer on the DISCOVERY did check the stack and tier weights prior to sailing, was happy with the result, and testified that in his view, there were no issues with respect to loading or stowage which in any contributed to the casualty.   [Ex. 60: Schaeffer Depo. pp. 49-52].)

The only explanation given for not checking the stack and tier weights was that there was no time.  [McDorr Tr. 351:8 – 353:5; Carbone Tr. 831:6 – 831:9, 836:21 – 836:23].  Of course, none of the ship's officers requested time to perform the calculations, and no protests were lodged.  If time was truly the concern, it was incumbent upon management to allow for the one to two hours necessary to insure the safety of the voyage.  In the alternative, management should have provided the vessels with computerized loading programs which could provide immediate warnings of stack and tier weight violations so that the ship's officers could comply with

---

[3] The calculations which should have been conducted by the crew are not the same detailed, technical calculations which are created and performed by naval architects to create container securing manuals. Rather, the crew should have calculated the total stack and tier weights to compare with the weights allowed in the CSM.  It is a simple function of addition rather than calculus.

management's "policy" requiring that checks be performed and any discrepancies corrected before sailing. [Keenan Tr. 707:25 – 709:3].[4]

The truth is that time was not the concern. Captain Carbone testified that the HAWAII incident brought these issues to the forefront, and as a result, they now always check the stack and tier weights prior to sailing. [Carbone Tr. 831:10 – 831:16, 847:3 – 847:17, 848:9 – 848:20, 856:7 – 856:9]. If there is sufficient time presently to conduct these calculations by hand, there was sufficient time in 2000. The bottom line is that they took a shortcut. Rather than spend the short time required to perform the stack and tier weight calculations, they simply went along with the proposed stow plan provided by the stow planners in Kaohsiung. They did not carry out the calculations which were required by the law and their own policy and which they knew were essential to ensure the safety of the voyage.

### 2.    *Maersk's appointed stevedores provided preliminary stow plans, but vessel officers made the ultimate decisions regarding stowage.*

Perhaps the most fundamental flaw in CSX's argument is the suggestion that Maersk made the stowage decisions – it did not. Maersk's appointed stevedores provided "preliminary" stow plans, but those plans were just that – preliminary. The record could not be more clear that a preliminary stow plan is a proposal. Captain Bergin testified:

> Q:    Let's go back for a minute to the prestow plan. I would like you to tell me, you have already touched on this briefly, but I would like you to tell me what role the prestow plan plays in the process, and, by that, what I mean is is it a mandate regarding where the containers go? Is it a proposal? What role does it play in the process?

> A:    It is just a proposal. The longshoremen or the stevedoring company that is doing the loading proposes that this is how the ship is going to be loaded, and they have to get the chief mate's approval.

---

[4] The Chief Mate on the PACIFIC, Mr. McDorr testified that computerized loading programs were available which performed the stack and tier weight calculations and were being used by other operators, but CSX vessels were not equipped with those loading programs. [McDorr Tr. 363:13 – 363:22].

Q:    In the proper performance of the chief mate's duties, is he required to check the prestow plan?

A:    Yes.

Q:    Does his duty include checking the GM stability?

A:    Yes.

Q:    Do his duties include checking the stack and tier weights?

A:    Yes.

Q:    In your opinion and based on your experience, would it be appropriate for a chief officer to accept the stow plan provided or the plan contained in the prestow without actually checking the numbers himself?

A:    It would not be appropriate.

[Bergin Tr. 426:16 – 427:20].

Just as the officers are required to check the GM and trim resulting from the pre-stow plan, the ship's officers have an affirmative obligation to check the stack and tier weights and require any changes necessary to ensure the safety of the vessel, its cargo, and most importantly, its crew. The vessel's officers are responsible for and make the ultimate stowage decisions. As an example, the Captain and Chief Mate on the DISCOVERY refused to load between 12 – 16 containers at Kaohsiung, believing it was unsafe to do so. [Ex. 60: Schaeffer Depo. pp. 21-22]. The Chief Mates on the HAWAII and PACIFIC elected not to check the stack weights, but they (not the stevedores) made the decision to sail with those loading plans, and CSX bears responsibility for those decisions.

In sum, the Contract incorporates COGSA in its entirety and the risk of improper stowage is squarely on CSX. Nothing in the Contract shifted the risk to Maersk. CSX acknowledged its responsibility to ensure proper stowage, and the vessel crews were aware of their responsibility.

16

Therefore, even if CSX is correct that the losses were caused by improper stowage, CSX bears full responsibility.

**POINT II**

**THE CONTAINERS WERE NOT LOST
AS A RESULT OF IMPROPER STOWAGE.**

For the reasons previously discussed, CSX bears full and sole responsibility for any stowage related issues. However, as will be demonstrated below, the losses in this case were not caused by problems with the loading plans.[5]

**A.      The Actual Stow Plans Did Not Create Excessive Forces.**

CSX argues that the containers were lost because there were stack weights which exceeded the allowable weights contained in the Container Securing Manuals ("CSM") (Pre-Hearing Statement by CSX p. 4 ¶ 3(a)). As explained by Dr. Petrie, CSX's argument is based on a misunderstanding of CSM loading plans and the role which they play in the loading process.

**1.      *The CSM is a guide, representing but one acceptable loading pattern.***

Dr. Petrie explained that a CSM loading plan does not establish maximum allowable stack weights. Instead, a CSM contains a loading pattern, which if followed, will ensure that there will be no excessive forces on the containers and securing gear. The loading pattern set forth in the CSM is not intended as the only acceptable loading pattern and does not necessarily result in maximum allowable forces on the containers and securing equipment. [Ex. 70: Petrie Decl. ¶¶ 4-5].

---

[5] It bears mention that CSX bears the burden of proving that the cause of the containers going overboard was something for which it is not responsible. As explained herein, the Contract incorporates COGSA and with that incorporation comes the COGSA burdens of proof. As the Panel is aware, this means that Maersk has satisfied its *prima facie* case against CSX because containers were delivered to CSX and either not delivered or damaged. The burden thus rests with CSX to prove that the losses were caused by an excepted cause under COGSA.

In the end, any loading pattern is acceptable provided it does not create forces which exceed the safe working load ("SWL") of the equipment which as by the American Bureau of Shipping ("ABS"). The loading pattern contained in the CSM is but one pattern which will yield forces on the containers and securing gear below the SWL. [*Id.* at ¶¶ 4-6]. A complicated set of calculations must be performed to determine whether a particular loading pattern will result in forces beyond what ABS allows. Recognizing that ship's officers do not have the training to perform these types of calculations, CSMs are placed on board to provide mariners with a loading pattern which will not result in excessive forces. [*Id.* at ¶¶ 4,6; Cushing Tr. 962:21 - :25; 963:1 - :13].

It is important to understand, however, that loading outside the pattern set forth in the CSM will not necessarily result in forces beyond what is permitted by ABS. The only way to determine if a particular loading pattern results in an excess of forces is to perform the calculations discussed above. Indeed, CSX's expert, Dr. Cushing, conceded that loading outside the pattern contained in the CSM will not necessarily result in excessive forces. For example the CSM for the HAWAII reflects a maximum container weight for the container in the upper right-hand corner of 4 tons. [Ex. 42]. However, Dr. Cushing admitted that placing a six-ton container in that spot, while a violation of the CSM, may not result in excessive forces:

> Q:   But if, in fact, you put a six-ton container in that spot, that would be a violation of the CSM?
>
> A:   Yes, if the GM was .8 meters, yes.
>
> Q:   Again, assuming a GM of .8 meters and a 6-ton container, that would be a violation of the CSM?
>
> A:   Yes.
>
> Q:   Would you agree with me that it would not necessarily create forces in excess of the safe working loads?
>
> A:   We have to refer back to a calculation in order to know that answer.

Q:    That is my point. You would have to do a calculation. Putting a container in excess of four tons in the upper right-hand spot, while it might be a violation of the CSM, it does not necessarily create forces in excess of the safe working load, correct?

A:    Not necessarily.

[Cushing Tr. 958:9 – 959:5]. Thus, Dr. Cushing concedes the validity of Dr. Petrie's analysis and theory, *i.e.* a stack weight in excess of what is permitted by the CSM will not necessarily result in excessive forces. The CSM loading pattern is a guide, but all of the weights must be taken into account and calculations performed to determine if a particular loading pattern results in forces beyond what is permitted by ABS.

## 2.    *The actual stow plans created acceptable forces within appropriate design criteria.*

Dr. Petrie performed those calculations, and his results are contained in Exhibits 43, 44 & 45. In performing his analyses, Dr. Petrie did two sets of calculations. First, he compared the forces created by the loading pattern outlined in the CSM with the forces created by the actual loading patterns on all three vessels. Second, he reviewed the forces created by the actual stow plans to determine if any of those forces exceeded the allowable forces set forth by ABS. As was explained by Dr. Petrie, the vast majority of the forces created by the actual load conditions were less than or equal to the forces which would have been created if the vessels were loaded in accordance with the loading pattern contained in the CSM. In addition, with the exception of one value on one stack on the PACIFIC, none of the forces created by the actual loading pattern exceeded the safe working loads set forth by ABS. Dr. Cushing did the same calculations, and based on the standard roll angle of 23 degrees, found that the actual loading pattern created no forces in excess of SWL permitted by ABS. [Ex 62, pp.10-12].

Dr. Cushing performed an additional analysis, calculating the forces created by the reported roll angle of approximately 45 degrees for each vessel. With a 45° roll, both the actual

loading patterns and the CSM loading patterns resulted in forces which exceeded the SWLs permitted by ABS. The actual loading patterns resulted in forces which exceeded the SWL by a greater margin, but the point is that even if loaded according to the CSM plan, the lashing gear would have been exposed to forces in excess of the SWLs based on the roll angles supposedly experienced. This is not surprising since there is no question that a vessel can roll to a degree where containers will be lost, no matter how safe the stow.

This is why safe loading patterns are those which are designed to withstand reasonably anticipated rolls. The patterns set forth in the CSMs in this case are based on anticipated rolls of 23 – 27 degrees. In his report, Dr. Cushing explains that prudent practice ("conventional maritime wisdom") is to design loading patterns such that they can withstand roll angles of up to 30 degrees. [Ex. 62: Cushing Report p. 14]. Significantly, Dr. Petrie explained that the actual loading patterns on all three vessels would not have resulted in any forces which exceed the SWLs based on a 30° roll. Thus, the actual loading patterns did not create any excessive forces under the design criteria set by Dr. Cushing – *i.e.* 30 degrees. [Ex. 70: Petrie Decl. ¶18].

Through this analysis, Maersk is not suggesting that it was appropriate for the CSX Chief Mates to ignore the stack weights or load outside the CSM loading plans without having a naval architect perform the calculations necessary to ensure no excessive forces were created. The point of the exercise is to demonstrate that there was very little difference between the forces created by the actual loading plans versus the CSM plans. Therefore, there must be something else in play – there must be some other reason why all three vessels suffered catastrophic equipment failures.

**B.    The Individual Voyages.**

With that background, the following is a brief discussion of the circumstances surrounding the losses on each vessel. (For the Panel's convenience, we have included a chart as Appendix 1 which sets forth the amounts claimed and settlements paid in connection with each vessel and a summary of the key facts relating to the losses).

*1.    The Hawaii voyage.*

On January 28, 2000, just after 0700, the HAWAII lost 20 containers over the port side at #5 hatch during a voyage from Kaohsiung, Taiwan, to Tacoma, Washington. [*See* Exs. 11-14: vessel documents]. For most of the subject sea passage, the weather was stormy, but typical for the North Pacific in the wintertime where one expects bad weather and following seas. [Carbone Tr. 815:21 – 816:4; Ex. 23: Dooley Report; Bergin Tr. 408:16–408:21, 432:11–432:20]. On the morning of January 28th, it was reported by the ship's crew that the vessel allegedly was experiencing Beaufort Force 9-10 wind conditions and took a 45° roll to port, when the containers fell overboard. [*See* Exs. 11-14: vessel documents]. The roll angle was not confirmed by any instruments (such as a clinometer) but was based on the subjective estimates of the crew, which are inherently unreliable. [Ex. 70: Petrie Decl. at ¶¶ 15-17]. Indeed, the Chief Mate of the vessel testified in these proceedings that the roll angle was 40 – 50 degrees and not 45 - 50 degrees as suggested by CSX now. [Ex. 50: Parr Decl.].

The evidence shows that the losses were caused by design and operational problems with the vessel itself, as well as improper maintenance of the vessel's cargo securing system. The HAWAII did not have a bilge keel, and due to her hull shape, she was susceptible to heavy rolls even in the slightest seas. [Bergin Tr. 440:23–441:3; Carbone Tr. 813:18 – 813:20; Bergin Tr.

441:17-441-20]. Indeed, Captain Carbone testified that this class of vessel began to roll even before leaving the harbor. [Carbone Tr. 791:8-792:6].

This tendency to roll increased the risk of stress on containers and lashing gear, which in turn increased the risk of losing containers. [Carbone Tr. 790:18 – 790:25, 813:21-814:7; Bergin Tr. 438:15 – 440:2]. Nevertheless, despite the vessel's tendency to roll and the expected winter conditions in the Pacific, Captain Carbone allowed the vessel to sail with only 0.1 feet excess GM, further increasing the risk of excessive rolling. [Ex. 34: Trim & Stability Summary; Bergin Tr. 431:12-432:2; 435:4 – 438:23]. Captain Carbone admitted that the vessel was tender and that he would have preferred more GM. [Carbone Tr. 814:16 – 814:22]. In the opinion of Captain Bergin, a master mariner with over 40 years sailing experience and 50-75 transit-Pacific winter crossings, the vessel had insufficient GM for the contemplated voyage. [Bergin Tr. 407-408, 438:10 – 438:23, 442:9 – 442:21].

In addition to these design and operational problems, the vessel was poorly maintained. [Ex. 35: photos].[6] After this incident, D-rings had to be replaced throughout the vessel and not just at the no. 5 hatch, a fact which is indicative of the poor condition of the vessel's cargo securing equipment. [Ex. 67: Puglia invoice no. 5557 showing renewals of D-rings at hatch nos. 4, 6, 7 & 8].

Furthermore, the pattern of damaged equipment clearly shows a fundamental problem with the vessel's securing equipment. [*See* Ex. 35 at photo nos. 49, 50 & 52]. As explained by Dr. Petrie, securing systems are designed such that the lashing bars, twist locks and D-rings will give way first – they are essentially the weak links. The D-rings are attached to pads which are

---

[6] We recognize that no definitive conclusions can be reached based on photographs, but we urge the Panel to review the post-casualty photographs of the lashing equipment. [Ex. 35]. They are a graphic example of the maintenance issues which existed on this particular vessel. [*See, e.g.,* Petrie Tr. 559:9 – 562:16].

in turn attached to the hatch cover. As explained by Dr. Petrie, the post-casualty photograph showed that one of the D-ring pads on hatch #5 pulled away from the hatch cover before the lashing gear failed. [*See* Ex. 35 at photo nos. 49, 50 & 52]. This should not happen. The fact that this pad gave way before reaching the breaking strength of the lashing gear clearly demonstrates a problem with the structural integrity of the vessel's securing system. [Petrie Tr.559:9 – 562:19].

### 2. *The PACIFIC voyage.*

On January 31, 2000, during a voyage from Kobe, Japan, to Tacoma, Washington, the PACIFIC lost 20 containers from the #12 hatch, port side. [Exs. 15-18]. For most of the sea passage, the weather was adverse, but again typical for the North Pacific in the wintertime. [Bergin Tr. 432:11–432:20; Ex. 23: Dooley Report]. At that time, the seas were running 20 to 25 feet and the wind was Beaufort Force 9. It was reported that the vessel allegedly took a 45° roll when the containers fell overboard. [*See* Exs. 15-18: vessel documents]. Again, the angle observation was based solely on estimates from the crew. [Ex. 70, ¶¶15-17].

The evidence establishes that the containers were lost as a result of the unseaworthiness of the vessel. As with the HAWAII, the PACIFIC did not have a bilge keel and was susceptible to excessive rolling. [McDorr Tr. 366:8 – 366:9]. According to Captain Bergin, she was known as a "roller." [Bergin Tr. 440:23 – 441:3]. Chief Mate McDorr was aware of the vessel's tendency to roll, but nevertheless, allowed the vessel to sail in a condition which increased that risk. The vessel sailed with a drag of 15 feet which increased the risk of being overtaken by following seas, such as existed in this case. [McDorr Tr. 332:4-332:7]. Captain Carbone testified that in his view, a 15 foot drag was excessive. [Carbone Tr. 816:12 – 816:15].

More importantly, however, Chief Mate McDorr allowed the vessel to sail with excessive GM, a condition which he knew would result in a stiff ship with the resulting snap rolls and risk of containers going overboard.  According to the vessel's Trim and Stability Booklet [Exhibit 25] a "GM in excess of 3.5 feet should be avoided *to reduce the loads on the deck container securing fittings*."  Notwithstanding this mandatory directive, Mr. McDorr sailed the ship with a GM of 4.61 feet - a violation of CSX's own guidelines designed to prevent the very thing which happened in this case.  [Ex. 30; McDorr Tr. 336:17 – 336:21, 326:15 – 326:22].  The vessel's excessive GM constituted an unseaworthy condition, for which CSX bears responsibility.

Finally, Dr. Petrie explained that based on his analysis, the loading pattern was not causally related to this loss.  As explained by Dr. Petrie, the dynamic forces created by any particular roll are the same on all container stacks.  In this case, the loading pattern was such that the forces created by the stow plan were virtually identical on the port and starboard side, and yet, there was a failure on the port side only.  Dr. Petrie therefore concludes that the failure was not due to the manner in which the containers were stowed or stacked, but due to external factors.  [Petrie Tr. 553:7 – 553:12, 557:23 – 558:10].  It is noteworthy that according to Dr. Cushing's calculations, even if the vessel had been loaded in strict compliance with the loading plan contained in the CSM, the reported roll of 45 degrees would have created forces in excess of the safe working loads permitted by ABS.  [Exs. 62 & 64].

### 3.    *The DISCOVERY voyage.*

The DISCOVERY is a MARAD Class C-7 containership built in 1968.  On a voyage from Kaohsiung to Tacoma, in late December 2000, she lost all 16 containers stowed on the port and starboard hatches of her #11 hatch as well as the entire #11 starboard hatch cover.

The evidence shows that the containers were not lost as a result of any stowage issues, but rather based on operational and maintenance issues with the vessel itself. Chief Mate Anthony Schaeffer checked the stow plan, including the stack weights before the vessel sailed from Kaohsiung. Mr. Schaeffer was satisfied with the stow plan and the manner in which the vessel was stowed. He testified that there were no stowage related problems which in any way caused or contributed to the loss of containers:

> Q:    Did the manner that the terminal in Kaohsiung had arranged for the stowage of the containers at hatch 11 cause or contribute to the loss of those containers?
>
> A:    No.
>
> Q:    Did the manner that the terminal at Kaohsiung had arranged for the lashing of the cargo at hatch 11 cause or contribute to the loss of those containers?
>
> A:    No.
>
> Q:    Did the manner that the terminal in Kaohsiung had arranged for the stowage of any of the cargo on the ship cause or contribute to the loss of the containers at hatch 11?
>
> A:    No.

[Ex. 60: Schaeffer Depo. pp. 51-52].

The DISCOVERY had considerable wastage and corrosion throughout the vessel including with its cargo securing equipment (*e.g.* deck sockets). [*See, e.g.,* Petrie Tr. 567:7 – 567:23; Ex. 37, photo nos. 29-32; & Ex. 46 at photo nos. 10A-D, 11A-D, 14A-B, 15A-B, 16A-B, 17A-B, 18A-B, 19A-D, 20A-D]. The deck fittings and sockets for the cone sockets had significant metal loss with the steel being very thin. [Ex. 37, photo nos. 5, 7, 10, 12-15]. According to Captain Bergin, these conditions were unacceptable. [Bergin Tr. 451:5 – 453:13]. Again, although no definitive conclusions can be reached based on photographs, we urge the Panel to review the post-casualty photographs of the lashing equipment, as they are a graphic example of the maintenance issues which existed on this particular vessel. As stated by Dr.

Petrie in response to questions posed by counsel for CSX, it is hard to review the photographs of the vessel and come away with any other conclusion but that the vessel was in a poor state of repair. [Petrie Tr. 633:11 – 633:25].

Prior to the subject voyage, the vessel was in a Singapore shipyard where "they renewed the gaskets on the hatches", as "some of the gasket housings were eroded [and] they had to replace them." [Ex. 60: Schaeffer Depo. at pp. 8-10]. On the #11 hatch, none of the hatch dogs on the starboard side were renewed, two were renewed on the aft port side with one not being aligned properly, and those on the forward end of the port side were not renewed. [*Id.* at 24-30]. Chief Mate Schaeffer believed that the shipyard did not properly align any of the gaskets they repaired. [*Id.* at pp. 24-30). He was aware of these problems with the hatch dogs prior to the subject incident. [*Id.*]

Chief Mate Schaeffer discovered the loss of containers on the morning of the 17th. His investigation revealed various problems with hatch dogs and broken lashing points throughout the vessel. [*Id.* at pp. 24-30]. With respect to #11 hatch, he believed that all 16 containers went overboard at the same time, when the hatch dogs on the starboard side broke loose. When 11 starboard went, it took everything that was on deck on the port side with it. [*Id.* at p. 45]. According to Chief Mate Schaeffer, there was a better than 50% chance that the hatch dogs were not secure at the time of the incident. [*Id.* at 24-30, 29].

Dr. Petrie explained that in his view, the physical evidence clearly showed significant problems with the vessel's cargo securing system. Again, Dr. Petrie explained that the lashing equipment (securing bars, twist locks and D-rings) are designed to give way first. In this case, the entire starboard hatch cover came loose. Indeed, Dr. Cushing admitted that the dog securing the hatch cover to the coaming should not give way before the lashing equipment. [Cushing Tr.

26

970:17-971:19]. According to Dr. Petrie, this demonstrates that there were substantial structure integrity problems with the system securing the hatch cover to the vessel. [Petrie Tr. 565:23 – 567:6].

Finally, as with the PACIFIC, according to Dr. Cushing's calculations, even if the vessel were loaded in accordance with the CSM loading plan, a reported 45 degree roll would have resulted in forces in excess of the safe working loads allowable by ABS. [Ex. 62].

### 4.    *Conclusion*

In sum, the undisputed facts demonstrate that the vessels were not seaworthy for their intended voyages and/or that the vessel's crews had an utter disregard for their obligations to care for the cargo – a duty imposed on them by virtue of COGSA, the common law and the Contract. [*See, e.g.,* Ex. 1, Article 7.1 referring to the "care" of the cargo]. As was aptly stated by the panel in *The M/V Caribbean Sky*, SMA No. 2827 (N.Y. Arb. 1992) (Berg, van Gelder & Sondheim):

> Regardless of which party carries liability under the charter party to supply the lashings or to pay stowing and securing, the ultimate responsibility for the safety of the ship, crew and cargo rests with the Master. He has the explicit duty to exercise due diligence to ensure that the ship is in all respects fit for the voyage. The evidence in this case is that the Master failed in that duty on the voyage in question.

### POINT III

### MAERSK WAS A SHIPPER VIS–À–VIS CSX AND IS ENTITLED TO REIMBURSEMENT FOR AMOUNTS PAID IN SETTLEMENT.

The Contract between Maersk and CSX provides that the United States Carriage of Goods by Sea Act governs the rights and liabilities as between Maersk and CSX. [Ex. 1, Article 7.1], thereby setting up a scenario whereby Maersk is a shipper vis-à-vis CSX. The shipper/carrier relationship is further confirmed in Clause 7.2, dealing with liabilities between

the parties, which states that CSX has precisely the same defenses to cargo claims by Maersk as Maersk has to its customers:

> As between the parties, CSX shall have the same rights, defenses, limitations, and exoneration as Maersk has to or against its shippers in relation to goods transported under this Agreement...

[*See* Exhibit 1, Clause 7.2].[7]

The obvious import is that CSX has only those defenses to claims by Maersk that Maersk has to its customers, *i.e.* Maersk is in a pass-through position. (Of course, with the exception of those causes for which the Contract specifically states that CSX has no responsibility, *see, e.g.* Clause 7.3 stating that CSX is not responsible for damages resulting from Maersk incorrectly completing or endorsing bills of lading.)

The Contract further provides that Maersk is authorized to handle and settle claims for loss and damage without prejudice to "...Maersk's rights or recovery as against CSX hereunder." [Exhibit 1, Article 7.8]. Maersk concedes, however, that as a prerequisite to reimbursement from CSX, any such settlements must be reasonable and consistent with all defenses available to Maersk (this is confirmed by Clause 7.2 which states that CSX can assert any defenses against Maersk which Maersk could have asserted against its customers).

With that contractual background, the issues in this case are two fold; first, whether Maersk is entitled to reimbursement from CSX.; and second, whether the settlements were reasonable and based on actual liability on the underlying claims. *See, e.g., Atlantic Richfield Co. v. Interstate Oil Transp.*, 784 F.2d 106 (2d Cir. 1986) (settling indemnitee is entitled to indemnity upon a showing (a) of the indemnitor's actual liability and (b) of the reasonableness of

---

[7] Indeed, during early settlement discussions with Mr. Messkoub, CSX's Mr. Witsman advised of his intention to assert a heavy weather defense against Maersk's claims, further demonstrating that CSX understood they were in a shipper/carrier relationship under the Contract.

the settlement); *B.S. Livingston Export Corp. v. M/V Ogden Fraser*, 727 F. Supp. 144, 148 (D.N.Y. 1989). The following is a brief discussion of each.

**A.    CSX is Liable Under the Contract, and Maersk is Entitled to Reimbursement.**

As explained above, the Charter incorporated COGSA and confirmed that the relationship between Maersk and CSX is that of shipper and shipowner/carrier. [Ex. 1: Article 7]. With the incorporation of COGSA comes the burden of proof applicable in COGSA cases. *In Re T/B Florida*, SMA No. 3628 (N.Y. Arb. 5/25/00) (citing *Phillips 66 Co. v. Marine Specialties Co.*, SMA No. 3026 (N.Y. Arb. 1993); *California and Hawaiian S. Co. v. Columbia S.S. Co., Inc.*, 391 F.Supp. 894, 897 (E.D. La. 1972), *aff'd* 510 F.2d 542 (5ᵗʰ Cir. 1975); *Horn v. Cia de Navigacion Fruco, S.A.*, 404 F.2d 422 (5ᵗʰ Cir. 1968); *The Venture*, SMA No. 2681 (N.Y. Arb. 1990).[8]

**1.    *Maersk has established a prima facie case of CSX's liability; CSX's disregard for the care of the cargo.***

There can be no legitimate dispute that Maersk has made out a *prima facie* case against CSX. The cargo was loaded onboard the vessels, and either not delivered or delivered in damaged condition. This evidence alone would be sufficient to satisfy Maersk's burden, but the

---

[8] As the Panel is aware, this means that Maersk can satisfy its burden by showing that it tendered cargo to CSX in good order and condition and CSX failed to deliver it. The burden then shifts to CSX to prove it is exonerated from liability by one of the excepted causes set forth in COGSA. If CSX proves an excepted cause, the burden shifts back to Maersk to establish that CSX's negligence contributed to the damage. Then CSX must establish what portion of the damage resulted from its negligence and what portion from the excepted cause, failing which CSX is liable for all the damage. *See Vallescura*, 293 U.S. at 307 (stating that "the carrier must bear the entire loss where it appears that the injury to cargo is due either to sea peril or negligent stowage, or both, and carrier fails to show damage is attributable to sea peril."); *see also In re M/V Nirja*, SMA No. 3426 (N.Y. Arb. 1998) (Jacobson, Quinn & Hawkins) (noting that with COGSA incorporation into charter party, COGSA burdens of proof including *Vallescura* apply); *In re M/V Maasstroom*, SMA No. 2944 (N.Y. Arb. 1993) (Asmus, Busch & Arnold); *In re M/V Trust 38*, SMA No. 2911 (N.Y. Arb. 1992) (Asmus, Jacobson & Mordhorst) ("if the carrier is the reason for some of the damage but not for some other, the burden is on the carrier to establish how much of each is to be assessed.").

evidence goes even further by reflecting CSX's utter disregard for the care of the cargo.[9]  CSX

had the duty to care for the cargo and the following facts demonstrate that CSX simply did not

care for the Maersk containers:

- CSX shore-side management and the vessel crews each recognized that the ultimate duty to care for the cargo rested with CSX.  Yet, CSX did nothing to ensure that the stack and tier weights were within acceptable limits.

- Although CSX recognized the need to ensure compliance with the CSM and to confirm no stack/tier weight excesses prior to sailing, none of the crews asked for more time to conduct the necessary calculations or formally protested the lack of time.

- CSX did not equip any of the vessels with computer programs to perform the necessary stack/tier weight calculations.

- As CSX's Captain Carbone testified, checking the stack and tier weights for compliance with the CSM was not on "the radar" in 2000.  Today, the vessel crew always checks the stack and tier weights by performing the necessary calculations by hand.  The vessels still are not equipped with computer programs even though such are available.

- Notwithstanding the purported stack and tier weight excesses, the HAWAII departed her last load port with insufficient GM for the intended voyage.  This deficiency meant the vessel was likely to experience prolonged rolls, which posed a greater risk of containers going overboard – a risk to both cargo and ship.  Not surprisingly, this is exactly what happened.

- Notwithstanding the purported stack and tier weight excesses, the PACIFIC departed her last load port with more GM than allowed by CSX's own guidelines.[10]  The vessel was too stiff which resulted in quicker roll periods -- a condition which posed a greater risk of containers going overboard.  CSX knew or should have known of the purported CSM violations and therefore should have taken measures to ensure a proper GM.  Again, the vessel crew did nothing to ensure a proper GM and it is thus not surprising that the crew reported a stiff ship with quicker roll periods and the resulting containers overboard.

---

[9] Thus, even if the COGSA burdens of proof did not apply in this charter party context, Maersk still has satisfied its burden of proving a *prima facie* case against CSX.

[10] Maersk submits that this fact demonstrates not only CSX's violation of its duty to care for the cargo but also that the vessel was not seaworthy.  A failure for which CSX is wholly liable.

- On the DISCOVERY, most of the hatch dogs on hatch #11 had not been renewed at the recent shipyard visit and of those that had, they were not properly aligned.  Chief Mate Schaeffer was aware of these problems before the voyage.  Not surprisingly, the hatch dogs came loose during the voyage – a factor which, according to the chief mate, contributed to the containers falling overboard.

- The chief mate of the DISCOVERY, Captain Schaeffer, also double checked the stow plans at Kaohsiung and he was comfortable with the stack and tier weights.  He felt there were no problems with the loading plan, when, according to CSX now, there were stack and tier weight excesses which presented a danger to the cargo, vessel and crew.  The chief mate's failure to detect and correct the purported stack/tier weight violations amounts to a breach of CSX's duty to care for the cargo.

## 2.   *CSX has not proven a defense*

CSX asserts that it is relieved of liability under COGSA because (1) the sea and weather conditions presented a peril of the sea under COGSA, and/or (2) the improper stowage constitutes shipper fault under §1304(2)(i).  Neither defense is sustainable here.

### (a)   *peril of the sea.*

Generally speaking, a peril of the sea occurs when conditions "'are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence.'" *See Thyssen, Inc. v. S.S. Euronity*, 21 F.3d 533, 539 (2d Cir. 1994).  It is a "fortuitous action of the elements at sea, of such force as to overcome the strength of a well-found ship or the usual precautions of good seamanship." *Taisho Mar. & Fire Ins. v. M/V Sea-Land Endurance*, 815 F.2d 1270 (9th Cir. 1987).

The determination of whether a peril of the sea exists is dependent on the facts of each case, and there is no general standard. *Id.* The ultimate conclusion turns on whether the weather conditions were foreseeable, given the location and time of the year. *Thyssen*, 21 F.3d at 539;

*Taisho*, 815 F.2d 1270.  If the weather was expectable, then no peril of the sea will be found. *The Sabine Howaldt*, 437 F.2d at 596; *Tecomar*, 765 F.Supp. at 1175.  The courts have been very reluctant to find a "peril of the sea", and very few cases, especially in New York, have granted a carrier exoneration from liability based upon this defense.  In fact, very few cases have qualified for a peril of the sea where the winds are Force 9 or less. *J.Gerber & Co. v. S.S. Sabine Howaldt*, 437 F.2d 580 (2d Cir. 1971).

Each of the incidents here occurred on North Pacific voyages in the winter months, namely January and December 2000.  The wind conditions experienced by each vessel were adverse (remaining between Force 8 and Force 10), but the weather was expectable.  [Ex. 23: Dooley Report; and Dooley Tr. 128:4 – 128:17].  Captain Larry Bergin, who has over 40 years experience and had over 50-75 trans-Pacific winter crossings, testified that the weather was not unusual for the winter North Pacific and he would not be surprised to have encountered it.  [Bergin Tr. 432:11 – 432:20].  The conditions were simply not of "an extraordinary nature or arise[n] from irresistible force or overwhelming power." *See Thyssen*, 21 F.3d at 539.  No peril of the sea existed and CSX has failed to meet its burden of proving the existence of a peril of the sea.[11]

### *(b)    shipper fault/improper stowage.*

Recognizing that the Contract does not support the argument that Maersk assumed the risk of stowage, CSX asserts that the purported weight excesses in the stow plan are, in essence, the responsibility of Maersk as they constitute shipper fault for which CSX is exonerated under COGSA.  This is the flip-side of the same argument addressed in Point I, because CSX is

---

[11] Apparently recognizing that its peril of the sea defense is not supported by the facts or the law, CSX has also intimated that each of the vessels encountered the recently popular phenomenon known as synchronous or parabolic rolling.  There was no expert or other testimony in support of this argument, and the argument amounts merely to speculation and conjecture.

arguing that the risk of improper stowage is to be borne by Maersk through a COGSA defense when pursuant to the governing Contract and accepted law, CSX bears that burden.

CSX cannot however establish its burden of proof on this defense by relying on the contract terms or the fact that Maersk paid the stevedores. *See M/V Arktis Sky*, 978 F.2d at 51 (the burden of proving shipper fault "cannot be carried by contract terms or language of FIOS"). Instead, CSX must carry its burden of proof that the damage did not occur because of its own acts. *Id.* at 52. On the current record, and as explained in Point II, CSX cannot carry that burden. The facts relative to each voyage refute any suggestion that the damage did not occur because of any acts of CSX.

### 3.    *CSX has failed to segregate the alleged causes of damage.*

Even if CSX could demonstrate a defense of peril of the sea and/or shipper fault based on improper stowage, CSX remains wholly responsible here. As explained above, CSX's actions reveal an utter disregard for the care of the cargo (*see* Point II(B)), and those negligent actions / un-seaworthy conditions, at a minimum, contributed to the containers falling overboard. As such, CSX bears the burden of proving what portion of the damage resulted from its negligence / un-seaworthiness and what portion from the excepted cause. *See Vallescura,* 293 U.S. at 307. CSX has not done so. As such, under controlling law, CSX is wholly liable for all the damage. *See Vallescura,* 293 U.S. at 307.

### B.    The Settlements Were Reasonable and In Fact, Favorable

As demonstrated above, CSX bears liability as vessel owner for the damages resulting from the containers going overboard. Consequently, Maersk is entitled to reimbursement for the settlements paid because they were eminently reasonable.

The cargo claimants established their *prima facie* case against Maersk because the cargo was loaded onboard the vessel, and either not delivered or delivered in damaged condition. The burden would have then shifted to Maersk to establish one of the defenses available under COGSA. In the course of evaluating the claims, Maersk considered a possible defense based on peril of the sea. [Messkoub Tr. 27:3 – 29:25]. However, for the reasons explained above, Maersk concluded that a heavy weather defense would not succeed. [*Id.*]. Under these circumstances, Maersk entered into settlement negotiations with the various claimants, to avoid the costs of having to defend the cargo claims where there was no viable defense. [*Id.*].

CSX was specifically advised of Maersk's intended course of action through the numerous discussions between Maersk's Mr. Messkoub and CSX's Mr. Witsman. Maersk specifically asked Mr. Witsman for his input, recommendations and suggestions, and Mr. Witsman indicated CSX's agreement for Maersk to "go ahead and settle as best as possible". [*Id.* 30:2-33:3]. CSX agreed with the general philosophy of settling the claims, and with the larger claims, Maersk specifically informed CSX of the amount of settlements being contemplated. [*Id.* at 32:9-33:2, 41:2-42:9, 44:15-45:20].

Maersk eventually settled all of the claims for an average of 50%. [Exs. 2A, 4A & 6A]. As explained by Attorney Dan McDermott, an experienced cargo lawyer, settlement at this level is fair and reasonable in cases such as this where the customary settlement percentage is 60-65%. [McDermott Tr. 199:19—200:8]. CSX has offered no testimony or other evidence in response to Mr. McDermott's expert testimony.

In fact, during the course of Maersk's settling of the claims and its numerous discussions with Mr. Witsman, neither Mr. Witsman nor anyone else from CSX lodged any objections to Maersk's approach in settling the claims. [Messkoub Tr. 53:24-54:8]. With the exception of the

Nike claims (for which Maersk was obligated to pay 100% pursuant to a service contract) and a single claim on the HAWAII, Mr. Witsman lodged no objections with respect to the actual settlements reached. [*Id.* at 54:24-58:14]. CSX's arguments now that Maersk should have further pursued the peril of the sea defense are makeweight, at best.

### POINT IV

### CSX COUNTERCLAIMS
### SHOULD BE REJECTED

For the reasons explained in Points I—III above, CSX's counter-claims for alleged damages suffered by the vessels as a result of the containers falling overboard should be rejected. More fundamentally, the counter-claims should be rejected (regardless of the liability determination discussed above) for an utter lack of proof.

In support of its counter-claims, CSX has submitted the Declaration of Joseph Breglia [Ex. 67] to authenticate the purported repair records as business records maintained by CSX. Lacking from the presentation, however, is any testimony or document reflecting an opinion that the repairs which were undertaken by CSX were causally related to or necessitated by the containers going overboard. A brief review of the documents submitted demonstrates that the repairs are not related to the casualties at issue and that CSX is over-reaching with its claims.

For instance, on the HAWAII, the containers which fell overboard were stowed on hatch no. 5. Yet, a large portion of the work for which CSX seeks recovery relates to the renewal of D-rings and doubler plates throughout the vessel at hatches no. 4, no. 6, no. 7 and no. 8. [*See* Ex. 67, Puglia invoice no. 5557, dtd 2/24/00, for the HAWAII]. The HAWAII claim also includes airfare for an unidentified person and there is no attempt by CSX to explain who the airfare pertains or what services he/she provided. Similarly so, there is no indication as to how the

expenses of the ABS surveyor can be taxed against Maersk, particularly when the repairs which were undertaken relate to parts of the vessel where the containers which went overboard were not located.

On the PACIFIC, the containers which fell overboard were located on the port side of the no. 12 hatch. Yet, the repairs for which CSX seeks recovery relate in large measure to the renewal of wasted steel in other parts of the vessel. For instance, Puglia invoice 5264, dtd 3/23/00, pertains to the renewal of a wasted plate above the #15 port fuel tank which is common with the no. 10 hold. [Ex. 67]. Puglia invoice 5723, dtd 5/2/00, refers to "insert wasted areas in the no. 6 port fuel oil tank", "repair leak in the no. 13 starboard fuel tank", and "28 inch section of wasted plate on the portside at hatch no. 7." Puglia invoice 5818, dtd 6/9/00, pertains to the renewal of the "hatch no. 4 cover guide" and hatch coaming. Finally, Puglia invoice 5937 refers to the renewal of wasted steel in the port fuel tank and no. 3 cargo hold.

Finally, with respect to the DISCOVERY (which involved containers falling overboard from #11 hatch), CSX seeks $9,832.12 for the fees of "Glosten Associates", but there is no back-up support or any other document explaining what Glosten Associates did in connection with the repairs. [*See* Ex. 67: HEC invoice 12944]. Puglia invoice 6368, dtd 1/17/01, refers to a repair to the aft peak fracture and twist lock casing at hatch #4. [Ex. 67]. Puglia invoice 6365, dted 1/17/01, pertains to repairs to the steam supply piping.

Again, there is not a scintilla of evidence suggesting that these repairs to wasted steel, piping, fuel oil tanks, etc. relate to the containers falling overboard in other areas of the vessel. CSX has made no effort to submit any such evidence and its' attempt to satisfy its burden of proof on the quantum of its counter-claims is woefully inadequate. Accordingly, CSX's counter-claims should be rejected for a failure of proof.

**CONCLUSION**

Based upon the foregoing, and the evidence which has been submitted, Maersk submits that it is entitled to full reimbursement for the settlements paid and expenses incurred in connection with defending the cargo claims asserted against it arising out of the three subject voyages. Maersk is also entitled to interest on the settlement amounts from the dates of payment, as well as its costs and attorneys fees.[12]

Respectfully submitted,

Wayne D. Meehan
Gina M. Venezia
FREEHILL, HOGAN & MAHAR, LLP
80 Pine St.
New York, NY 10005
(212) 425-1900
Attorneys for Maersk

TO:    David W. Martowski, Esq.
       91 Central Park West
       New York, New York 10023

       Mr. Jack Berg
       c/o Transammonia, Inc.
       320 Park Avenue
       New York, New York 10022

       Mr. Manfred W. Arnold
       840 Shackamaxon Drive
       Westfield, New Jersey 07090

       M.E. DeOrchis, Esq.
       DeOrchis & Partners
       61 Broadway - 26th Floor
       New York, N.Y. 10006

---

[12] Should the Panel award fees, Maersk reserves its right to submit affidavit testimony concerning the amount of costs and fees incurred herein, including the costs of this submission which as yet have not been finalized.

NYDOCS1/286264.1                                    37

Eric Danoff, Esq.
Emard, Danoff, Port & Tamulski, LLP
49 Stevenson Street - Suite 400
San Francisco, California 94105

# Exhibit E

Meehan Affidavit in Support

IN THE MATTER OF THE ARBITRATION

-   between  -

MAERSK SEALAND, as Charterer,

-   against  -

CSX LINES, LLC, as Owner

Under a Space Charter and Transportation
Service Contract dated 9 December 1999

BEFORE: David Martowski, Chairman
           Jack Berg
           Manfred Arnold

# CHARTERER MAERSK'S
## REPLY BRIEF

Freehill Hogan and Mahar, LLP
Attorneys for Charterer Maersk - Claimant
80 Pine Street 24th Floor
New York, New York 10005
212 425 1900

Wayne D. Meehan *of counsel*
Gina M. Venezia, *of counsel*

EXHIBIT

E

tabbies

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

SUMMARY OF ARGUMENT ...........................................................................1

**POINT I:**

COGSA WAS INCORPORATED IN ITS ENTIRETY, AND CSX IS
RESPONSIBLE FOR ANY STOWAGE RELATED ISSUES.....................................2

    A.    There Was No Partial Incorporation. .................................................2

    B.    Fairly Read, the Contract Imposes Responsibility for Stowage on CSX. ..............4

    C.    Payment for Stevedoring Services Without More Does Not
        Shift Responsibility to Maersk...........................................................5
        1.  The cases relied upon by CSX do not support its position. .................5
        2.  CSX's position actually refutes its argument & demonstrates
           that payment for services is distinct from responsibility for services...............7

    D.    Even If the Stowage Responsibility Had Been Shifted to Maersk,
        CSX Still Bears the Full Responsibility................................................8

**POINT II:**

COGSA WAS FULLY INCORPORATED,
INCLUDING THE APPLICABLE BURDENS OF PROOF.........................................9

**POINT III:**

THE SETTLEMENTS WERE REASONABLE AND CSX'S
CRITICISMS ARE WITHOUT MERIT..............................................................12

    A.    Settlement of the Four Nike Claims.................................................12

    B.    Hawaii Claim No. 7. ...................................................................13

    C.    Discovery Claim No. 6. ...............................................................14

**POINT IV:**

CSX'S COUNTERCLAIMS SHOULD BE REJECTED. ...........................................................14

**POINT V:**

MAERSK'S RESPONSES TO CSX'S ARGUMENTS. ...........................................................15

**CONCLUSION** ...........................................................................................................................21

## INTRODUCTION

This reply brief is submitted by Claimant-Charterer Maersk ("Maersk" or "Charterer") in response to the post-hearing arbitration brief submitted by Respondent-Owner, CSX Lines (hereinafter "Owner" or "CSX").

## SUMMARY OF ARGUMENT

CSX argues that the voyages in question were not "common carriage" in an effort to distinguish the precedent making it clear that owner (in this case, CSX) bears responsibility for improper stowage. This is a distinction without difference. Maersk agrees that COGSA is not applicable to these voyages as a matter of law. Maersk further agrees that where COGSA is incorporated by contract, the parties are free to shift in the contract the stowage responsibility (which rests with owners under COGSA) to charterers. The point is that there was no such shifting in this case, and CSX's argument notwithstanding, arranging for and paying for stevedoring services without more is legally insufficient to shift responsibility to Maersk. Indeed, all of the cases which CSX cites where charterer was held responsible for stowage involve contracts with specific language construed to shift responsibility to charterers. Here, where there is no language shifting responsibility to Charterers, responsibility for any problems with stowage rests squarely on CSX.

CSX's argument fails for a more fundamental reason – it is based on the incorrect premise that Maersk made the stowage decision. Maersk provided a preliminary plan – nothing more. The ship's officers had an affirmative obligation to check that plan and request any changes necessary to ensure the safety of the vessel, its cargo and crew. Indeed, CSX's company policy required it. The ship's officers (not Maersk stow planners) made the decision to sail the vessel based on the pre-stow plan provided and CSX bears responsibility for those decisions.

CSX agrees that it is their responsibility to check the GM, agrees that it is their responsibility to check the lashing gear, and agrees that it is their responsibility to check the vessel's trim, but without textual support in the Contract, takes the position that somehow checking the stack weights falls outside of CSX's responsibility.

Finally, even if responsibility for proper stowage was shifted to Maersk, CSX still bears full responsibility. The law is clear that where bad stowage poses a risk to the cargo itself, it is bad stowage and nothing more. Conversely, where bad stowage poses a risk to the vessel itself, it rises to unseaworthiness for which owner is fully responsible. CSX admits that stack weight violations increase the risk of containers breaking loose and that losing containers over the side poses a grave risk to the vessel itself. Therefore, to the extent that CSX is correct that there were causally-related stack weight violations, those excessive stack weights constituted unseaworthiness for which CSX is responsible.

## POINT I

### COGSA WAS INCORPORATED IN ITS ENTIRETY, AND CSX IS RESPONSIBLE FOR ANY STOWAGE RELATED ISSUES.

**A.    There Was No Partial Incorporation.**

CSX points out that the Contract only provides for "carriage, custody and care" of the cargo pursuant to COGSA. CSX suggests that this is an indication that the parties intended that Maersk was responsible for stowage. We refer the Panel to page 6-11 of Maersk's Main Brief where this issue was discussed in detail. We will not repeat those arguments herein. Suffice it to say that when asked about language in the Contract supporting the proposition that Maersk was responsible for stowage, the CSX representative who negotiated the Contract (Mr. John Keenan)

could point to no such supporting language. He certainly attached no significance to the "partial incorporation", which counsel for CSX relies on. New York arbitration panels have also routinely held COGSA fully incorporated based on language saying only that "carriage" would be pursuant to COGSA. (*See* Maersk Main Brief pp 9-11). It is thus difficult to understand how CSX can even argue that "carriage, custody and care" pursuant to COGSA does not contemplate a full incorporation and does not include the obligation to check the stack weights prior to sailing – what could be more critical to the proper "custody and care" of the cargo?

Noticeably absent from CSX's brief is any authority supporting its position that the lack of the words "loading" and "stowing" in the COGSA incorporation clause means that COGSA was only partially incorporated. The only case cited by CSX for this partial incorporation theory is *Great Am. Ins. Co. v. M/V Handy Laker,* 2003 AMC 116 (S.D.N.Y. 2002). (*See* CSX's Brief p.14). In *Handy Laker,* however, the issue was not whether the failure to list all activities involved in an ocean carriage (*e.g.* loading, stowing, securing, etc.) renders the incorporation of COGSA partial. The charter party in that case stated that "it is expressly agreed that owners shall have the benefit of the rights and immunities in favor of the carrier or ship contained in the enactment in the country of shipment given effect to the Hague Rules." 2003 AMC at 137. The district court correctly found that where the contract expressly incorporated only those COGSA provisions favorable to the vessel, the remaining provisions in COGSA were not incorporated.

In marked contrast, the Contract here contains a general incorporation, stating that "the carriage, custody and care of goods hereunder shall be subject to...COGSA". The Contract does not, as CSX is apparently suggesting, refer only to duties that are favorable to vessel owner. Moreover, the contract in *Handy Laker* contained a specific provision that cargo was "...to be loaded, stowed, dunnaged, lashed and secured where necessary and discharged by

Charterers/Shippers/Receivers' Stevedores *free of risk* and expense to the vessel..." Under that particular contractual scenario, the district court correctly concluded that the parties had not incorporated those portions of COGSA which place responsibility for stowage on owners. In sum, the *Handy Laker* case is distinguishable on the facts and provides no guidance on the issue now before this Panel.

The Contract in this case is more similar to those in *Rio Energy Int'l Inc. v. Moran Towing*, SMA No. 3628 (N.Y. Arb. 2000) (Brown Sheinbaum & Martowski), and *M/V Jo Anne*, SMA No. 3026 (N.Y. 1993) (Nichols, Winer and Martowski). There, the governing contracts only stated "the *carriage* of cargo...shall be subject to...COGSA." (Emphasis added). Notwithstanding the lack of any reference to each of the activities listed in COGSA (*e.g.* loading, stowing, care, etc.), both panels found that this language incorporated COGSA in its entirety.

**B.    Fairly Read, the Contract Imposes Responsibility For Stowage on CSX.**

This entire "partial incorporation" argument is inventive, but there is no language in the Contract which can even be arguably read to suggest that Maersk is responsible for stowage. Indeed, a fair review of the Contract shows that the parties intended CSX to be responsible for stowage. At page 2 of its Brief, CSX points out that Maersk issued bills of lading to its customers which incorporated COGSA in full. CSX fails to mention clause 7.2 of the Contract which provides as follows:

> As between the parties, CSX shall have the same rights, defenses, limitations and exoneration as Maersk has to or against its shippers in relations to goods transported under this agreement . . .

(*See* Exhibit 1, clause 7.2). Under that provision, CSX has the *same* rights and defenses against Maersk that Maersk has against its customers. Maersk has no defense against its customers based on improper stowage, and similarly, CSX has no such defense against Maersk. It is

noteworthy that the section of the Contract dealing with liabilities and indemnities (Article 7) specifies that certain responsibilities fell on Maersk (*see e.g.* clause 7.3 holding Maersk responsible for damages arising out of the issuance of bills of lading). Thus, when the parties wanted to allocate responsibility to Maersk, they did so in the Contract, but there was no such allocation of responsibility for stowage to Maersk. The Contract clearly contemplates Maersk in a pass-through situation for all claims, with the exception of those resulting from causes specifically allocated to Maersk. There was no allocation of responsibility for stowage to Maersk, and we urge the Panel to enforce the parties' agreement.

**C.    Payment for Stevedoring Services Without More Does Not Shift Responsibility to Maersk.**

> 1.    *The cases relied upon by CSX do not support its position.*

CSX cites several cases where charterers paid for stevedoring services and were held responsible for the consequences of improper stowage. However, as illustrated below, all of the cases which CSX relies upon involve contracts which have specific language construed to impose the stowage responsibility on charterers. <u>CSX has not cited one case where the charterer was held responsible for stowage based on the payment for stevedoring services alone, *i.e.*, without a specific contractual provision construed to impose that obligation on charterers.</u>

For instance, CSX cites *Sumitomo Corp. of Am. v. M/V SIE KIM*, 632 F.Supp. 824 (S.D.N.Y. 1985) (CSX Brief p. 12), for the proposition that payment for stevedore expenses shifts the risk of stowage to charterers. The decision in *M/V SIE KIM* does not stand for that proposition. In that case, the court properly found that the parties were free to allocate responsibility for stowage and found owners not responsible for stowage based on FILO (Free In Liner Out) and C&F Terms in the contract which the court found placed responsibility for all risk

and expense on cargo until loading was completed. *Id* at 841. Not surprisingly, counsel for CSX

makes no reference to footnote 15 of the opinion where the court explained that its decision was

not based on which party paid for the services, but rather, based on its finding that the FILO

provision imposed responsibility for stowage on cargo:

> The allocation of payment functions alone properly is given little
> weight, since relatively predictable costs can be presumed to be
> passed on regardless of their initial placement. FILO provisions,
> however, do more than simply allocate responsibility for payment.

*Id* at 136, n.15.  Of course, there are no such provisions in the Contract between Maersk and

CSX.

CSX also cites *Sigri Carbon Corp. v. Lykes Bros. S.S. Co., Inc.*, 655 F.Supp. 1435 (W.D.

Ky. 1987) (CSX Brief, pp. 12-13), in support of its argument that payment of stevedoring

expenses shifts the risk of loss. Again, CSX overstates the authority. In *Sigri*, the court was

faced with a specific contract term which provided that the cargo was to be loaded "FIOS" –

"free in, out stowed." The court found that this particular contract term shifted the risk of

stowage to the charterer because the charterer controlled the actual stowage. The district court

held that the vessel owner was not responsible for the consequences of improper stowage by

agents of the shipper pursuant to a FIOS bill of lading.[1]  Here, there is no term in the Contract

such as the FIOS term there and there is no evidence that Maersk "controlled" the loading or that

the vessel played no part in the loading. Indeed, as Chief Mate Schaeffer testified, the vessel

crew decided what containers could and could not be loaded. [Ex. 60: Schaeffer Depo. pp. 21-

---

[1] In *Dempsey & Associates v. Sea Star*, 461 F.2d 1009, 1017 (2d Cir. 1972), also cited by CSX (*see* CSX Brief pp. 15-16), the voyage charterer, Jordan, paid the stevedore expenses and was found responsible for damage caused by improper stowage. The charter party, however, stated that the cargo was "to be loaded, stowed and discharged *free of risk* and expense to the vessel". *Id.* at 1012. The court found that this clause placed responsibility for stowage on Jordan. *Id.* at 1018. Thus, again, it was the contract language which supported the court's allocation of responsibility to the charterer. CSX overstates the holding of this case when it suggests that it was the payment factor which was dispositive.

22]. The ship's officers checked the lashings, they checked the trim, and they checked the GM. They dropped the ball by not following company policy requiring that they check the stack weights, but make no mistake – the ship's officers were in charge of the loading operations.

Furthermore, *Sumitomo* and *Sigri* were expressly criticized by the Second Circuit in *Associated Metals & Minerals Corp. v. M/V ARKTIS SKY*, 978 F.2d 47 (2d Cir. 1992), in which the court explained that payment terms do not decide the question of who bears the risks. CSX tries to distance itself from *ARKTIS SKY* by suggesting that that case involved a situation where COGSA applied as a matter of law. However, as explained herein and in numerous arbitration decisions, when parties to a private contract of carriage agree to incorporate COGSA, the entire statutory scheme is applicable. (*See* discussion, *infra*, at Point II). Thus, the fact that COGSA applied as a matter of law in *ARKTIS SKY* is irrelevant. More to the point, the Second Circuit's criticism focused on the *Sumitomo* and *Sigri* courts' rationale that an agreement to pay for stevedore charges somehow shifted the responsibility for ensuring proper stowage to the paying party. That criticism applies equally in a private carriage situation.

### 2. CSX's position actually refutes its argument & demonstrates that payment for services is distinct from responsibility for services.

In an effort to sidestep the negligence and failure of their own ship's officers to comply with company policy, CSX argues that the ship's officers acted as agents for Maersk with respect to stowage decisions, and any negligence attributable to those ship's officers falls on Maersk. From the outset, the principle that the ships' officers act as agent for charterers *vis-à-vis* stowage issues is applicable only in those cases where the contract language shifts responsibility for stowage to charterers. As mentioned above, there was no such shifting in this case.

This argument by CSX is significant, however, since it clearly shows that payment for services is not dispositive of responsibility. In those cases where ship owners are deemed to be

acting for the charterer with respect to decisions relating to stowage, they continue to be paid by

owners and yet charterers are saddled with their negligence.  In making this argument, CSX

acknowledges that which party pays for the particular services involved is a separate issue from

which party has assumed responsibility for the operation.

**D.**    **Even If The Stowage Responsibility Had Been Shifted To Maersk, CSX Still Bears The Full Responsibility.**

As pointed out by the authors of *Voyage Charters*, an owner is not entirely immune from

responsibility for improper stowage even when carried out by stevedores acting under charterers

instructions:

> To the extent stowage decision affect the seaworthiness of the
> vessel, the owner will be responsible.  If the negligent or improper
> stowage merely affects the safety of the cargo, however, the
> charterer will bear responsibility.

Julian Cooke, et al., *Voyage Charters* p. 242 ¶ 11,122 (3d ed. 2007).  As was explained by

Captain Bergin and confirmed by CSX's Thomas McDorr, excessive stack weights increase the

risk of containers going over the side, which poses a risk not only to the cargo, but to the vessel

itself.  [McDorr Tr. 332:16-332:20; Bergin Tr. 431:12-432:2].  Therefore, even if stowage

responsibility had been shifted to Maersk, CSX remains fully responsible for any causally-

related stack weight violations.

Both COGSA and the general maritime law impose an absolute warranty of

seaworthiness upon an owner of a ship.  *See, e.g., Atlantic Banana Co. v. M/V Calanca,* 342

F.Supp. 447, 454 (S.D.N.Y. 1972).  If cargo is damaged as a result of a breach of the warranty of

seaworthiness, the ship will be held liable.  *See id.; Am. Home Ass. Co. v. M/V Slettter,* 43 F.3d

995, 998 (5th Cir. 1995).  A ship will be deemed unseaworthy if the vessel is not reasonably fit to

carry the cargo it has contracted to transport.  *The Silvia,* 171 U.S. 462 (1898).  Liability for

unseaworthiness has in fact been found where the Master has acquiesced to poor stowage by a charterer that rendered the ship unseaworthy. *Olsen v. U.S. Shipping Co.*, 213 F. 18, 20 (2d Cir. 1914).

In *Olsen*, the vessel owner sought to recover from the charterer amounts paid to bill of lading holders for cargo jettisoned during a voyage. The district court allowed the claim on the ground that the cargo losses resulted from improper loading, which was done by the charterer. On appeal, the Second Circuit reversed reasoning:

> It would, in our opinion, be unwise and dangerous to impair the implied warranty of seaworthiness of the ship herself. The district judge rightly held that the steamer was unseaworthy on leaving Ship Island. The jettison was caused not by sea peril, but by her own instability. It makes no difference whether this was due to the amount or the stowage of the deckload alone or also to the fact that the largest ballast tank could not be filled. All these matters were under the absolute control of the master and it was his duty to see that they were right. It was no excuse to him that the charterers did the loading; insisted upon his taking the deckload or that surveyors certified that the ship could do so safely.

*Olsen*, 213 F. at 20-21.

## POINT II

## COGSA WAS FULLY INCORPORATED, INCLUDING THE APPLICABLE BURDENS OF PROOF.

Maersk agrees that COGSA does not apply to these voyages as a matter of law. However, when COGSA is incorporated by contract (as it was here), all of the judicial interpretations of COGSA, including the COGSA burdens of proof, are applicable. Consider the following:

- In *M/V Venture*, SMA No. 2681 (N.Y. Arb. 1990) (Nelson, Berg & Martin), the panel found that COGSA was incorporated through the Asbatankvoy clause stating "the carriage of cargo under this charter party . . . shall be subject to" COGSA. The panel

concluded that "since there was an incorporation of the entire COGSA, the parties are bound by the judicial interpretations which the courts have placed on those words including the placing of the burden of proof."

- *M/V Maasstroom*, SMA No. 2944 (N.Y. Arb. 1993) (Asmus, Busch, & Arnold), involved private carriage where COGSA was incorporated by contract.  There, the vessel owner claimed that it was not liable because of an inherent vice.  In rejecting the owner's argument, the panel explained:

> The panel does not accept Owners' contention that the mere mention of inherent vice shifts the burden of proof upon cargo. The burden of proof rests with the party claiming the exemptions, i.e. Owners. ... 'To establish these claims, and thus "enforce their respective rights under the Act, litigants must engage in the ping-pong game of burden-shifting mandated by COGSA."

*Id.* (quoting *Office of Supply, Gov't of the Rep. of Korea v. Naftoporos*, 1987 AMC 687

(S.D.N.Y. 1987).

- In *Rio Energy Int'l Inc. v. Moran Towing of Texas, Inc.*, SMA No. 3628 (N.Y. Arb. 2000) (Brown, Sheinbaum & Martowski), the panel explained that when COGSA is incorporated into a charter party, the shifting burdens of proof under COGSA apply.  The panel explained:

> The foregoing reasoning provides a sound rationale for concluding, as have other authorities cited supra, that charterer's establishment of a prima facie case (here by proving delivery to the vessel in good condition / out-turn contaminated) puts the burden of explanation on the shipowner. That seems to be only common sense, as the shipowner is the party most likely to possess any such evidence, particularly as to subsection 1304(2)(q) or other exceptions concerning the vessel. It would be at least incongruous to incorporate COGSA without any recognition of the relevant court decisions in the light of which COGSA was enacted and judicial interpretation of COGSA itself. To do so would only inject unnecessary and unjustifiable uncertainty as to the primary stage of burden of proof which Intercontinental aptly describes as "partly integral to COGSA and partly the result of judicial gloss."

*Id.* (internal citations omitted).

- In *M/V Jo Anne*, SMA No. 3026 (N.Y. 1993) (Nichols, Winer and Martowski), the Panel held that where COGSA is incorporated by contract, charterer makes out its *prima facie* case by proving that the cargo was delivered in good order and condition and outturned in damaged condition. The burden then shifts to the owner to come forward and prove that the loss and damage was not due to its negligence or was caused by one of COGSA's exceptions.

For reasons discussed in Maersk's Main Brief (*see* pp. 27-29), Maersk and CSX are in a shipper/carrier relationship under the Contract, and as is clear from the cases cited above, by incorporating COGSA, the parties incorporated the COGSA burdens of proof. Therefore, Maersk makes out its *prima facie* case by proving delivery of the cargo in good order and condition, and non-delivery. The burden then shifts to CSX to prove an excepted cause under COGSA. If CSX proves an excepted cause, the burden shifts back to Maersk to prove that CSX's negligence contributed to the loss. If Maersk establishes contributory negligence on the part of CSX, under the Supreme Court's decision in *Vallescura*, CSX bears the burden to segregate what portion of the loss is due to an excepted cause, or bear responsibility for the entire loss.

In the context of this case, there is no question that Maersk has made out its *prima facie* case. The containers were delivered to the vessel and lost at sea. For reasons outlined in Maersk's Main Brief (*see* pp. 31-33), CSX cannot establish an excepted cause under COGSA either based on peril of the sea or fault attributable to shipper. Moreover, to the extent that CSX was able to establish an excepted cause, the record is absolutely clear that CSX is guilty of causally-related negligence. (If for no other reason then that the ship's officers failed to check

the stack weights in accordance with CSX company policy, *see* discussion of CSX faults, Maersk's Main Brief pp. 29-31). CSX has not segregated, and cannot segregate, the damage, and under the Supreme Court's decision in *Vallescura*, CSX bears responsibility for the entire loss.[2]

**POINT III**

**THE SETTLEMENTS WERE REASONABLE AND CSX'S
CRITICISMS ARE WITHOUT MERIT.**

CSX acknowledges that Maersk settled all the claims and admits that the vast majority of the settlements were reasonable. CSX challenges the reasonableness of six claims (*see* CSX Brief pp. 18-19), but the record reflects that these too were reasonable, under the circumstances.

**A.    Settlement of the Four Nike Claims.**

CSX complains that Maersk paid too much on the four Nike claims[3] because the settlement values were not based on CIF value but retail value and included, among other things, lost profit in the claim calculation. [*See* HAWAII Claim No. 6 & DISCOVERY Claim Nos. 1-3, on Exs. 2A & 6A]. Yet, under COGSA, a cargo claimant can recover lost profits as well as other incidental expenses; CIF is not the limit of damages recoverable. *Kanematsu-Gosho Ltd. v. M/T Mesiniaki Aigli*, 814 F.2d 115, 118 (2d Cir. 1987); *Valerina Fashions, Inc. v. Hellman Int'l Forwarders, Inc.*, 1996 AMC 1201 (S.D.N.Y. 1995) (damages are not limited to invoice price); *see also Neptune Orient Lines, Ltd. v. Burlington N. & S.F. R. Co.*, 213 F.3d 1118 (9th Cir. 2000) (mere replacement costs deprive a manufacturer of expected profit and do not compensate him

---

[2]Although the COGSA rules for assigning burdens of proof are applicable here (as explained above), Maersk has successfully carried its burden even if the standards applicable to private carriage should be applied here, as the record reflects that CSX is guilty of casually-related negligence/unseaworthiness. (*See* Maersk's Main Brief pp. 29-31).

[3] As explained, Maersk paid 100% of the Nike claims asserted, but is seeking to recover only 50% of those settlements from CSX.

fully).  Furthermore, Maersk was able to achieve settlement of these claims without having to incur attorney's fees or becoming involved in protracted litigation where there were no substantive defenses to the claim.  Maersk therefore maintains that the claim for reimbursement of 50% of the Nike settlements is reasonable and that CSX is therefore responsible for the reimbursement.

**B.    Hawaii Claim No. 7.**

On the HAWAII, Claim No. 7 [Ex. 2A], CSX maintains that Maersk should have treated the number of pallets as the package for limitation purposes rather than the number of cartons. [*See, e.g.*, Messkoub Tr. 70:24 – 73:10; CSX Brief p. 19].[4]   In making this argument, CSX relies on *DCI Management Group, Inc. v. M/V MIDEN AGAN*, No. 03-448, 2004 U.S. Dist. LEXIS 8547 (S.D.N.Y. May 14, 2004) (cited at p. 19 of CSX's brief), where the pallet was deemed a COGSA package when the bill of lading disclosed both the number of cartons and pallets.

There is, however, conflicting authority on the point and the issue is by no means clear-cut as implied by CSX. *See, e.g., Ins. Co. of N. Am. v. M/V Frio Brazil*, 729 F.Supp. 826 (N.D. Fla. 1990) (cartons were the package); *Bando Silk Co., Ltd. v. HYUNDAI COMMANDER*, No. 91-3415, 1994 U.S. Dist. LEXIS 3835 (S.D.N.Y. March 31, 1994) (pallets not the package); *Royal Ins. Co. of Am. v. M/V MSC Dymphna*, 2004 AMC 785 (S.D.N.Y. 2004) (summary judgment denied on pallet vs. carton issue).  Given the state of the law on this point, Maersk acted reasonably in achieving settlement without having to incur attorney's fees and costs which would have been expended in litigating this issue on the HAWAII Claim Number 7.

---

[4] During the hearings, CSX also intimated that it was challenging whether Maersk had in fact paid the settlement of this claim, notwithstanding Mr. Messkoub's testimony explaining it had been paid by wire transfer.  We were disappointed that counsel for CSX would put us to the task, but we submitted the Affidavit of Attorney Ed Radzik, who received payment of the settlement, which affidavit flatly refutes the suggestion the settlement was not paid. [Ex. 24: Radzik Affidavit].

C.   **Discovery Claim No. 6.**

Finally, Claim No. 6 on the DISCOVERY [Ex. 6A] was pending in Canada for approximately US $293,636 and was settled for $170,000 in June 2006. CSX considers this settlement to be unreasonable, because they assert that U.S. COGSA would apply and the package limit would thus be only US$105,000. [*See* Ex. 7, Tab 6C]. Yet, U.S. COGSA does not apply to a shipment destined for Canada (which this shipment was), as COGSA applies only to shipments to and from the U.S., and once interest and costs are considered, the $105,000 figure would amount to $150,000 in any event. Further, under Canadian Hague-Visby (which applies in Canada), there would have been no package limitation protection, as the limit, plus interest and costs, would approach CAN $450,000.

CSX suggests that they should not be liable for the higher limitation applicable in Canada since Maersk, not CSX elected to ship to Canada. CSX's argument should be rejected. First, CSX is involved in the international container trade and knows full well that certain containers brought into the U.S. will be destined for Canada. Further, the bill of lading indicates that the shipment was destined for Canada where a higher limit applies and CSX is bound to that description for purposes of determining the limitation. [*See* Ex. 1, Clause 7.1]. More fundamentally, CSX is guilty of a breach of contract and is responsible to Maersk for all losses which flowed from that breach, including the reasonable value of the claim presented by the Canadian receiver.

### POINT IV

### CSX'S COUNTERCLAIMS SHOULD BE REJECTED.

For the reasons outlined in Maersk's Main Brief (pp. 35 – 36), CSX's counterclaims should be rejected. Simply put, Maersk is not responsible for any stowage-related issues which

may have existed. Moreover, at page 15 of CSX's brief, CSX admits that the ship's officers had a duty to CSX to insure proper stowage so as to prevent damage to the ship. (CSX's Brief p. 15). Thus, if any stowage problems caused damage to the vessels, any responsibility rests with the ship's officers for failing to comply with company policy requiring that stack weights be checked prior to sailing. The counterclaims should be dismissed on this basis alone.

More fundamentally, however, CSX's claim should be denied based on a lack of proof. CSX presented no testimony that the claimed repairs were related to or necessitated by the loss of containers. Indeed, a brief review of the documents clearly demonstrates that many of the claimed items were maintenance related, clearly unrelated to these incidents. (*See* Maersk Main Brief pp. 35-36). As a claimant, CSX has an affirmative obligation to specifically document the items claimed and establish causation. CSX has failed to carry that burden, and the counterclaims should be dismissed.

## POINT V

## <u>MAERSK'S RESPONSES TO CSX'S ARGUMENTS.</u>

The following are specific arguments made by CSX in its post-hearing arbitration brief and Maersk's responses:

- **Maersk is responsible for stalling and delays which increased legal expenses, and Maersk took an unreasonable position in this case by insisting on full reimbursement.**

From the outset, delays do not result in additional legal fees — the cost of presenting the case is the same whether put on in 6 months or 2 years. Hiring two separate law firms and having four lawyers attend arbitration hearings is what results in excessive, unnecessary fees. Moreover, CSX has no one to blame but itself for the time which it has taken to close these

proceedings. From February of 2002 through January 2005, the arbitration was stalled at CSX's request.

We refer the Panel to the Declaration of Andrew Tsukamoto, Senior Director and Counsel for Maersk Inc.'s Risk and Claim Management Department. [Ex. 69]. As explained by Mr. Tsukamoto, Maersk and CSX attempted to settle these claims on several occasions without involvement of attorneys. In February 2002, when it appeared that negotiations were at a standstill, Maersk indicated its intention to proceed with the arbitration. (*Id.* at ¶¶9-10). On two separate occasions, CSX asked that Maersk refrain from moving forward, in the hopes that settlements could be reached. Maersk agreed, and notwithstanding a specific representation from CSX that they would provide a written settlement offer in January 2005, no such offer was ever made. (*Id.* at ¶¶10-12)

CSX's decision to submit an affidavit from Mr. Witsman suggesting that Maersk allowed the case to drag on and that Maersk was insisting on 100% reimbursement is not only an inappropriate disclosure of the content of settlement discussions, it is inaccurate. As is pointed out in Mr. Tsukamoto's Declaration (submitted in response to Mr. Witsman's) during the course of these proceedings, this firm contacted counsel for CSX in an effort to discuss settlement. (*Id.* at ¶13). Counsel for CSX advised that CSX had instructed them not to engage in settlement discussions with our office. That is CSX's prerogative, but it is unfair for CSX to attempt to influence the Panel's deliberations by continually suggesting that Maersk has been unreasonable in settlement discussions, when CSX has refused to allow its attorneys to even discuss settlement.[5]

---

[5] Normally, discussions regarding settlement fall outside what is appropriate for submission to an arbitration panel, but CSX "opened the door" by submitting Mr. Witsman's affidavit and continually arguing that Maersk is responsible for delays and that Maersk has been unreasonable in insisting on full reimbursement.

- **Only Maersk containers were lost.**

CSX continually argues that only the containers loaded by Maersk stevedores were lost. What else would we expect? The Maersk containers were loaded last at the last port prior to sailing and obviously the highest containers (which by definition would be loaded last) would be the first to go. Moreover, this argument does not answer the question of responsibility. If, as CSX maintains, the preliminary loading plans provided by Maersk-appointed stevedores were improper, the ship's officers had an affirmative obligation to insist on changes which were necessary to insure the seaworthiness of the vessels.

- **Maersk advised it would call a witness to testify about the Contract, but never did.**

We did advise the Panel that we contacted Mr. Martin Coniff, the lawyer who was involved in negotiating the Contract on behalf of Maersk. Not surprisingly, Mr. Coniff had no specific recollections of the negotiations. If CSX had not raised its "partial incorporation" argument for the first time six years after the voyages ended in its pre-hearing statement, perhaps memories would have been fresher. In any event, why would Maersk even consider bringing a witness to testify regarding the meaning of the Contract, when Mr. Keenan, who CSX represented to be the individual who "negotiated the original space charter" and was tendered to testify regarding the "intent of the parties", could point to no language suggesting stowage responsibility was shifted to Maersk and based his view on liability solely on the fact that Maersk arranged and paid for the stevedores. (*See* DeOrchis letter dated October 16, 2000).

- **Maersk-appointed stevedores did not consult loading software provided by CSX.**

Relying solely on the testimony of Mr. McDorr, CSX argues that it provided computer software to the stevedores which displayed red lights when stack weights were excessive and that

the stevedores did not know how to use that CSX program. (CSX Brief pp. 5, 9-10). CSX's description of the testimony is wrong.

Contrary to CSX's suggestion, Mr. McDorr did not testify that CSX provided software to the stevedores that was in use at the time of these incidents. Mr. McDorr instead explained that after the DISCOVERY incident (the last of the 3 voyages), he learned that the Navis software was starting to be used "at the end of 2000" and was being implemented "slowly" and that "rumors were" that "CSX was going to use Navis." [McDorr Tr. 288:11-289:23]. Thus, his testimony does not support the suggestion that the Navis software was in existence and being used at the time of these incidents, and in fact, refutes any suggestion that CSX had provided the software to the stevedores – CSX had not even started using it at the time of McDorr's investigation after December 2000. There is simply no evidence at all to support CSX's statement that the stevedores "did not know how to use the CSX Lines' computer program for loading". (CSX Brief p. 5).

Further, CSX's argument about it providing software to the stevedores begs the question of why it did not provide the same software to its crew, if it was in existence. Is it possible that CSX provided software to the stow planners which provided automatic warnings of stack weight violations, but did not provide that software to the vessels? If so, CSX bears responsibility for that failure.

- **There was not enough time to check stack weights,**

At pages 9-10 of its brief, CSX attempts to excuse its failure to check the stack weights by arguing that there was insufficient time and the process was " . . .much harder than it might at first appear." CSX argues that the calculations were complicated since the cargo securing manuals are voluminous and each stack has so many variables. (CSX's Brief p. 10). Exhibit 42

is the CSM loading plan for the HAWAII. The loading plan is a one-page document, and performing the calculations is a simple matter of adding up the weights in the individual stack and verifying that the weight does not exceed the number in the individual box contained on that one page loading plan.

Time was never the issue. Indeed, Mr. Carbone testified that as a result of the HAWAII incident, they now always check the stack weights prior to sailing. If it is feasible now, it was feasible in 2000. Indeed, Mr. Carbone's testimony shows that timing was not the concern, but rather (although he was "ashamed to admit the fact") checking the stack weights was simply not on their "radar screen." [Carbone Tr. pp. 848-49].

- **Dr. Petrie's analysis is incorrect, since he did not take into account the 45° rolls.**

Counsel for CSX knows full well that Dr. Petrie was not attempting to calculate the forces which would have been created by reported rolls of 45-50°. In fact, Dr. Cushing's analysis clearly shows that 45° rolls would have resulted in forces in excess of the safe working loads under both the actual loading plans and the loading plan outlined in the container securing manual. [Ex. 62]. The point of Dr. Petrie's analysis was to show that there was very little difference between the forces created by the actual loading plans versus the CSM plans. In fact, no plan is perfect, and no particular loading plan can withstand any sea conditions and any rolls. However, the plans in this case were acceptable. The actual loading plans resulted in substantially the same forces as the plans contained in the CSM and were adequate to guard against reasonably anticipated conditions. Indeed, Dr. Cushing states in his report that proper practice is to design plans which are adequate to withstand rolls of 30°. In this case, the actual loading plans would have resulted in no forces in excess of the safe working loads, based on 30° rolls. [Ex. 70: Petrie Decl. ¶ 18].

In the final analysis, the loading plans were fine – the problem here was that due to design issues (no bilge keels, susceptibility to rolling) and operational issues (excessive drag, problems with GM) the vessels rolled to a point (and in a manner) where no loading plan was safe – to a point where even the CSM loading plan would have resulted in forces in excess of safe working loads. To make matters worse, the lashing and securing gear was poorly maintained and post-casualty investigations revealed that the dogs securing the hatch cover to the coaming on the DISCOVERY failed resulting in the loss of the starboard hatch cover and the D-ring pads on hatch no. 5 on the HAWAII pulled out before the lashing gear failed. The fact that components of the vessels' securing systems gave way before the lashing gear failed shows significant structural integrity problems with the securing systems on those vessels.

- **CSX is entitled to an adverse inference based on Maersk's failure to produce survey reports or conduct metallurgical tests.**

Given the apparent poor condition of the vessels themselves depicted in the photographs [Ex. 35 at photo nos. 49, 50 & 52; Ex. 37, photo nos. 29-32; & Ex. 46 at photo nos. 10A-D, 11A-D, 14A-B, 15A-B, 16A-B, 17A-B, 18A-B, 19A-D, 20A-D], CSX predictably argues that no definitive conclusions can be drawn from the photographs. In addition, CSX argues that Maersk's failure to provide survey reports or metallurgical tests suggests that the Maersk surveyors were aware that there no problems with the vessel's equipment.

It is noteworthy that neither CSX nor Maersk produced any contemporaneous survey reports which drew conclusions regarding the cause of the loss or the condition of the vessels' securing fixtures.[6] This Panel has been around long enough to know why there are no such reports. At the time of these incidents and the onboard investigations, both CSX and Maersk

---

[6] CSX produced the reports of Travers for the Hawaii and Pacific. On the Hawaii, the surveyor concluded that the cause of the loss was heavy weather, but did not test the equipment or otherwise comment on the structural integrity of the equipment. On the Discovery, Travers concluded there was insufficient information to determine the cause. There was no Travers report produced on the Discovery.

were facing substantial cargo claims, and preparing opinions regarding the cause of the loss and documenting the deplorable condition of the lashing gear and securing equipment on board the vessels through metallurgical testing would only have inured to the benefit of cargo interests, to the detriment of both CSX and Maersk.

The better question is why CSX did not perform testing on its own equipment, when it specifically knew that the condition of its lashing equipment was at issue and now argues that the equipment was fine? The reason is obvious. Based on the initial physical inspections at the time of the voyages, it was clear that testing would not be beneficial to CSX. It bears mention that CSX never introduced the maintenance records of the lashing and securing gear required to be kept by company policy [Exs. 28 & 29; McDorr Tr. 344:18-348:10]. It is also noteworthy that Dr. Cushing testified that he wanted to inspect the lashing equipment as part of his investigation, but was told by counsel that the equipment was "not available". [Cushing Tr. 937:2-938:25]. (A fact which we know is not correct, since counsel for CSX advised that the equipment was available for testing during the course of this arbitration.)[7] It is obvious that CSX did not want Dr. Cushing to inspect that equipment.

## CONCLUSION

For these reasons, as well as those discussed in Maersk's main brief, Maersk is entitled to full reimbursement from CSX for the reasonable settlements paid to cargo interests, plus interest, costs, and attorney's fees. Further, CSX's counterclaims for unproven vessel damage should be rejected.

---

[7] Indeed, reports produced by CSX during the course of this arbitration reveal that at the time of the incidents, CSX's surveyors reported to CSX that the vessel's securing fixtures were removed and inventoried as "evidence."

Respectfully submitted,

Wayne D. Meehan
Gina M. Venezia
FREEHILL, HOGAN & MAHAR, LLP
80 Pine St.
New York, NY 10005
(212) 425-1900
Attorneys for Maersk


TO:     David W. Martowski, Esq.
        91 Central Park West
        New York, New York 10023

        Mr. Jack Berg
        c/o Transammonia, Inc.
        320 Park Avenue
        New York, New York 10022

        Mr. Manfred W. Arnold
        840 Shackamaxon Drive
        Westfield, New Jersey 07090

        M.E. DeOrchis, Esq.
        DeOrchis & Partners
        61 Broadway - 26th Floor
        New York, N.Y. 10006


        Eric Danoff, Esq.
        Emard, Danoff, Port & Tamulski, LLP
        49 Stevenson Street - Suite 400
        San Francisco, California 94105

# Exhibit F

## Meehan Affidavit in Support

IN THE MATTER OF THE ARBITRATION

-   between -

MAERSK SEALAND, as Charterer,

-   against -

CSX LINES, LLC, as Owner

Under a Space Charter and Transportation
Service Contract dated 9 December 1999

BEFORE: David Martowski, Chairman
                 Jack Berg
                 Manfred Arnold

**DECLARATION OF**
**AOGU ANDREW TSUKAMOTO**

I, AOGU ANDREW TSUKAMOTO, declare as follows:

1.      I am   the Senior Director and Counsel for Maersk Inc.s' Risk and Claim Management Department, a department within A.P. Moller-Maersk A/S (currently doing business under the trade name "Maersk Line"), as successor in interest to A.P. Moller Group-Dampskibsselskabetaf 1912, Aktielselskabet Dampskibsselskabet Svendborg (formerly trading under the trade name "Maersk Sealand") (hereinafter "Maersk").

2.      I am familiar with the facts and circumstances surrounding the assertion of the claims in this matter by Maersk against CSX in connection with each of the three voyages performed under the Space Charter and Transportation Service Contract between the parties (hereinafter the "TP1 Agreement" or "Agreement").  I was personally involved in the settlement negotiations with CSX and have personal knowledge of the matters testified herein, except where noted.



3.    While I normally would not comment on discussions between the parties during attempts at resolution, I feel it is necessary to respond to certain arguments advanced by CSX in these proceedings.

4.    First, I understand that CSX has taken a position in this case that although the Agreement specifically incorporates U.S. COGSA at Article 7.1, that incorporation was partial. CSX has asserted that because the paragraph incorporating COGSA refers to "carriage, custody and care of goods", CSX's duties to care for the cargo did not include the duty to properly and carefully stow the cargo – a duty required by COGSA.

5.    I find the assertion of this argument surprising.  We have been discussing these claims with CSX for many years, and they agreed that the case was governed by COGSA without indicating anything about the purported partial incorporation.  In fact, in an email to me on November 9, 2004, CSX's P&I Club representative stated:  "We believe that the Maersk/CSX Space Charter should be considered a contract for private carriage which incorporates COGSA." There was no limitation of this statement.

6.    Further, Massoud Messkoub of my office and I met with representatives of CSX and their P&I Club in November 2004, to discuss this case and again there was never any suggestion that the incorporation of COGSA was in any way limited.  In fact, the only substantive argument made by CSX on this issue was that since Maersk arranged and paid for the loading, Maersk should bear responsibility for any stowage issues. We pointed out that the law provides that owners remain responsible for stowage in the absence of a clause shifting

2

responsibility to charterers (such as exists in a NYPE charter party form), and payment for stevedoring does not act to shift responsibility to charterers.

7.    The first time that CSX asserted this partial incorporation argument was well after our November 2004 meeting, and *after* Attorney Eric Danoff was appointed to represent CSX in this matter.

8.    Second, I have read the Declaration of Mr. Ed Witsman submitted by CSX in these proceedings. He states that Maersk has allowed these claims to drag on and that Maersk has always insisted on 100% reimbursement. Again, while I normally would not comment on settlement discussions, I feel it is necessary to respond to Mr. Witsman's allegations, as they are simply false.

9.    It bears mention that throughout 2000 – 2001, Maersk handled all of the negotiations with the myriad cargo interests, processing all of the claims and achieving reasonable settlements at roughly 50% of the various claims presented. Maersk began discussing with CSX an amicable resolution to these claims in early 2001. Although CSX initially indicated a willingness to settle the claims and in fact made an offer on two of the vessels, they withdrew their offer, and the efforts to resolve this matter were unsuccessful. Towards the end of 2001 and the beginning of 2002, we negotiated the posting of security by CSX. In February 2002, we indicated our intent to demand arbitration, and CSX asked that we refrain from doing so for an additional thirty (30) days.

10.    In May 2002, we demanded arbitration of CSX and CSX immediately requested that we place the arbitration on hold and seek to resolve the claims in a principal-to-principal

3

meeting. We agreed to hold off at CSX's request and asked the two party-appointed arbitrators to refrain from appointing a third arbitrator for the time being.

11.    In the Spring of 2004, after no resolution was achieved, we again indicated our intention to move forward with the arbitration by asking that the party-appointed arbitrators appoint a Chairman. Chairman Martowski was appointed in August 2004, and we were prepared to move forward with the arbitration.

12.    CSX again requested that we refrain from proceeding and that the parties attempt settlement in a principal-to-principal meeting. Mr. Messkoub and I met with representatives of CSX and its P&I Club on November 12, 2004. At that meeting, CSX stated that they would provide us with a written offer in January 2005 for our consideration. Despite this indication, no offer was ever made by CSX. We then decided to move forward with the arbitration.

13.    We have also during the course of these proceedings asked our attorneys, Freehill, Hogan & Mahar, LLP, to discuss settlement with the attorneys for CSX. I understand from Mr. Meehan that he has approached counsel for CSX about settlement, but Mr. Danoff and Mr. DeOrchis advised him that CSX instructed them not to engage in settlement discussions with Freehill's office.

14.    Again, I am reluctant to provide this information concerning the parties' settlement negotiations, but I feel it is necessary since in his declaration, Mr. Witsman improperly attempted to cast Maersk as delaying the claims and stated that Maersk was insisting on 100% recovery. It always has been and remains Maersk's position that they would consider any reasonable offer of settlement, but to date, CSX has made no offers at any level other than

4

the initial offers made by Mr. Witsman in the summer of 2001.    CSX is under no obligation to

settle, but it is inaccurate and unfair for Mr. Witsman to suggest that we are insisting on 100%

where they have made no offers and have instructed their lawyers to refuse to negotiate with our

attorneys.


I declare under the penalty of perjury of the laws of the United States that the foregoing is

true and correct.

DATED:    May 17, 2007


AOGU ANDREW TSUKAMOTO

5